# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 05-3183

———————

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | *  Appeal From the United States |
| v. | *  District Court for the |
| | *  District of South Dakota. |
| Wicahpe George Milk, | * |
| | * |
| Appellant. | * |

———————

Submitted:  March 14, 2006
Filed:   May 12, 2006

———————

Before COLLOTON, HEANEY, and GRUENDER, Circuit Judges.

———————

HEANEY, Circuit Judge.

This case involves a homicide that occurred on the Pine Ridge Indian Reservation. Following a jury trial, Wicahpe George Milk (Wicahpe) was convicted of second-degree murder for killing Arlen Bissonette. The district court[1] sentenced Wicahpe to 135 months in prison, to be followed by three years of supervised release. On appeal, Wicahpe challenges the sufficiency of the evidence, and further contends

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

that he is entitled to a new trial on account of evidentiary errors and prosecutorial misconduct.  Lastly, he argues that his sentence is unreasonable.  We affirm.

## BACKGROUND

We recount the evidence in the light most favorable to the jury verdict, as we are required to do.  In the afternoon of October 15, 2004, Wicahpe, Bissonette, and several others were at Wicahpe's residence drinking and socializing.  At some point, Curtis Milk, Wicahpe's father, arrived with Petan Milk, Wicahpe's brother.  Curtis, who was intoxicated, tried to start a fight with Bissonette, but was unsuccessful.  Instead, many of the revelers moved the party away from Curtis, reconvening at Larry Bettelyoun, Sr.'s house.  Shortly thereafter, Curtis also arrived at the house.  Curtis became hostile again, causing a number of people, including Bissonette, to leave and return to their prior venue.  Curtis and Wicahpe remained at Bettelyoun, Sr.'s house.

After some time passed, Wicahpe returned to his residence.  He was visibly upset, and complained that his father was treating him badly while he was at Bettelyoun, Sr.'s.  According to Larry Bettelyoun, Jr., Wicahpe's face had red marks on it and looked as if he had been assaulted.  Wicahpe told Bissonette that Curtis still wanted to fight Bissonette, and Wicahpe encouraged Bissonette to do so.

Bissonette then left with Jeff Curry to confront Curtis.  Bissonette entered Bettelyoun, Sr.'s residence and attacked Curtis.  Bissonette, a muscular young man many years Curtis's junior, beat Curtis badly, leaving him bloody and barely conscious.  The wounds sustained by Curtis were consistent with blows from brass knuckles carried by Bissonette.

Bissonette then returned to Wicahpe's residence, and told Wicahpe that he had "handled that for him." (Trial Tr. Vol. I at 89.)  This prompted Wicahpe and Petan to go back to Bettelyoun, Sr.'s house.  They entered that home to see their father lying

in a pool of blood on the floor, gurgling and laboring for breath. When Wicahpe saw this, he told his brother Petan that they should "get" those responsible, presumably referring to Bissonette. (Id. at 51.) The two then took Bettelyoun, Sr.'s car back to Wicahpe's residence.

Wicahpe then arrived at the house, driving so quickly and recklessly that he rammed the porch of the house and nearly hit a person who was standing outside. He went inside and saw Bissonette still there. Wicahpe, upset, began questioning Bissonette about what had happened to his father. Wicahpe picked up a long knife from the counter and broke the telephone. Wicahpe and Bissonette exchanged words for a short time before Petan entered, holding what was described as some type of stick or shaft. At that point, Wicahpe, Petan, Bissonette, and Curry began to fight. In the struggle, both Bissonette and Curry were stabbed by Wicahpe and struck by Petan. Bissonette's injuries included two stab wounds, which punctured his lung and his kidney. Bissonette also sustained significant head trauma from Petan's attack. He died later that night. An autopsy attributed the death to the stab wounds with the possibility that the head trauma was a contributing factor.

Wicahpe and Petan were jointly charged by indictment with committing second-degree murder in Indian country and aiding and abetting each other to do the same, in violation of 18 U.S.C. §§ 1111, 1153, and 2. Both went to trial. At trial, Wicahpe's primary defense was that of self-defense. His theory was that Bissonette was known to be very violent when he was drinking, and when it appeared that Bissonette was becoming combative, Wicahpe felt it necessary to stab him to protect himself. In support of this theory, Wicahpe presented evidence that Bissonette had attacked someone in a vehicle earlier in the day by opening the vehicle's door and then punching and kicking the occupant. Testimony also established that Bissonette had chased another person, Ben Long Wolf, while trying to fight him. Wicahpe's evidence also included the fact that Bissonette had brutally attacked his father

moments before the stabbing, leaving Curtis with severe and serious injuries that appeared to be the result of a brass knuckle assault.

In further support of his self-defense theory, Wicahpe sought to introduce evidence of another assault Bissonette had perpetrated years earlier. According to Wicahpe, he, Bissonette, and Mike Ten Fingers had been playing a card game in 1999. When Bissonette lost, he became upset and stabbed Ten Fingers several times with an instrument resembling an ice pick. The district court did not admit this evidence, however, ruling that its probative value was outweighed by its prejudicial effect. In reaching this conclusion, the court reasoned that this assault happened roughly five years before the stabbing, and that in the meantime, Bissonette and Wicahpe had remained close friends, which suggested Wicahpe was not scared of Bissonette. Moreover, the court held that admitting this evidence might lead to a collateral mini-trial, confusing the jury.

Following a two-day trial, Wicahpe was convicted of second-degree murder. Petan was acquitted of all charges. At sentencing, both parties agreed on the guidelines range of 135 to 168 months. Wicahpe moved for a downward departure based on victim conduct. The government informally asked for consideration of an upward departure based on the use of a weapon, and because the guidelines had increased the second-degree murder penalty subsequent to this incident. After considering those motions, the presentence report, and statements made at the sentencing hearing, the district court determined that a guidelines sentence was appropriate, based on the factors enumerated in 18 U.S.C. § 3553(a). Wicahpe was sentenced to 135 months in prison, to be followed by three years of supervised release. This appeal followed.

## ANALYSIS

On appeal, Wicahpe contends that he was entitled to a judgment of acquittal on all charges because he acted in self-defense. In the alternative, he suggests that the evidence established only that he was guilty of some form of manslaughter, not second-degree murder. Next, Wicahpe argues that it was reversible error to exclude the evidence that Bissonette had violently assaulted Ten Fingers five years earlier because that evidence was essential to Wicahpe's state of mind. Wicahpe also argues that the prosecutor engaged in serious misconduct by knowingly presenting perjured testimony and by making improper remarks in his closing argument and rebuttal. Lastly, Wicahpe believes that the unique circumstances of his case make a guidelines sentence unreasonable.

## I.   SUFFICIENCY OF THE EVIDENCE

In considering whether a motion for judgment of acquittal was properly denied, we view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence. United States v. Cline, 570 F.2d 731, 733 (8th Cir. 1978). Although a federal defendant bears the burden of production on the issue of self-defense, once that burden is met, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense. United States v. Scout, 112 F.3d 955, 960 (8th Cir. 1997) (quoting United States v. Alvarez, 755 F.2d 830, 842 n.12 (11th Cir. 1985)); see also United States v. Deon, 656 F.2d 354, 355 (8th Cir. 1981) (noting that once the issue of self-defense is raised, the burden shifts to the government to disprove the theory).

Wicahpe agrees that the district court correctly instructed the jury on the issue of self-defense. That instruction noted that it was the government's burden to prove beyond a reasonable doubt that Wicahpe was not acting in self-defense. The court further instructed the jury that self-defense was defined as follows:

If a person reasonably believes that force is necessary to protect himself or another person from what he reasonably believes to be unlawful physical harm about to be inflicted by another and uses such force, then he acted in self defense or defense of another person.

However, self defense which involves using force likely to cause death or great bodily harm is justified only if the person reasonably believes that such force is necessary to protect himself or another person from what he reasonably believes to be a substantial risk of death or great bodily harm.

(Final Instruction No. 2.)

Wicahpe's theory at trial was that Bissonette was volatile and violent when drinking, and that he was forced to arm himself with a knife and stab Bissonette to save himself. Having reviewed the record, we find substantial evidence presented to the jury that tended to negate the idea that Wicahpe acted in self-defense. For instance, before leaving his wounded father, Wicahpe told his brother Petan that they should "get" Bissonette. (Trial Tr. Vol. I at 51.) The two then commandeered another person's car to return to Wicahpe's house, driving so erratically that they hit the porch of the house before stopping. Wicahpe then entered the house, armed himself with a knife, and verbally confronted Bissonette until Petan entered with his weapon. Thereafter, Wicahpe attacked Bissonette with the knife, stabbing him twice. From this evidence, the jury could reasonably infer that Wicahpe's intent was to hurt or kill Bissonette to avenge the maltreatment his father suffered.

Wicahpe further contends that even if he is not entitled to an outright judgment of acquittal, he is only guilty of some form of manslaughter, not second-degree murder. He rests this argument on two bases: (1) that he has an "imperfect" self-defense, and (2) the evidence of provocation overwhelmingly rebuts any suggestion that he killed Bissonette with malice aforethought.

-6-

An imperfect self-defense involves the defendant's unreasonable use of deadly force to thwart an assault.  Rinehart v. Brewer, 561 F.2d 126, 132 (8th Cir. 1977).  This may be proven by evidence that:  (1) the defendant unreasonably but truly believed that deadly force was necessary to defend himself, or (2) the defendant inadvertently caused the victim's death while defending himself in a criminally negligent manner.  See, e.g., United States v. Anderson, 201 F.3d 1145, 1151 (9th Cir. 2001) (explaining differing theories of imperfect self-defense claims); United States v. Manuel, 706 F.2d 908, 915 (9th Cir. 1983) (same); see also United States v. Brown, 287 F.3d 965, 975 (10th Cir. 2002) (recognizing that a defendant may commit involuntary manslaughter "if he acts in self-defense but is criminally negligent in doing so").  A defendant who proves an imperfect self-defense does not have the requisite mens rea to be guilty of second-degree murder.  Rinehart, 561 F.2d at 132.  The defense does not exonerate the defendant of culpability for a homicide, but justifies only a manslaughter conviction.  Id.

Principally for the reasons stated above, Wicahpe has failed to show that he is entitled to an acquittal of second-degree murder on his imperfect self-defense claim.  An imperfect self-defense claim is premised on the view that some action was necessary for the defendant to protect himself.  But in this case, the evidence, when viewed in the prosecution's favor, showed that it was actually Wicahpe who initiated the assault with the intention of fighting, hurting, or killing Bissonette.  This is inconsistent with a self-defense claim, be it a perfect or imperfect one.

Wicahpe also maintains his innocence on the charge of second-degree murder based on provocation.  "It is well established that if the defendant had enough time between the provocation and the killing to reflect on his or her intended course of action, 'then the mere fact of passion would not reduce the crime below murder.'"  United States v. Bordeaux, 980 F.2d 534, 537-38 (8th Cir. 1992) (quoting Collins v. United States, 150 U.S. 62, 65 (1893)).  In this case, the time between Wicahpe's emotional response to his father's injuries and the stabbing mitigates against a viable

provocation defense. After seeing his wounded father, Wicahpe set out to find Bissonette. Once Wicahpe arrived, he and Bissonette spoke before engaging in a fight.[2] Driving to a different location and then verbally confronting an intended victim for some time before assaulting him is inconsistent with the claim that Wicahpe acted impulsively without any self-control. Moreover, Wicahpe's assault did not begin until Petan entered the house, holding a weapon. Taken together with the evidence that Wicahpe was seeking revenge, this supports the inference that Wicahpe maintained enough self-control to plan an attack with Petan, in which Petan would make a delayed entrance while Wicahpe stalled.

## II.  EVIDENCE OF BISSONETTE'S PRIOR BAD ACTS

Wicahpe next contends that the district court committed reversible error by excluding evidence that Bissonette had violently stabbed a mutual acquaintance five years earlier. Wicahpe attempted to introduce this evidence under Federal Rule of Evidence 404(b), as relevant to Wicahpe's state of mind for self-defense. The government contends that the evidence is inadmissible as a specific instance of conduct. We review the district court's evidentiary rulings for an abuse of discretion. United States v. Waloke, 962 F.2d 824, 829-30 (8th Cir. 1992).

Rule 404(a)(2) permits inquiry into a victim's character, and Rule 405(b) allows that proof to come by way of specific instances of prior conduct "[i]n cases in which character or a trait of character . . . is an essential element of a charge, claim, or defense." (Emphasis added.) In Waloke, this court recognized that in a self-defense case, evidence of the victim's violent character, as proven through specific prior acts, may be admissible. Waloke, 962 F.2d at 830. We affirmed the exclusion of such evidence in Waloke because the district court was within its discretion to

_____

[2]The trial transcript reveals nothing that Bissonette said or did to incite Wicahpe during their pre-fight conversation.

prohibit the evidence under Rule 403. Id. Thus, the government's contention that evidence of a victim's prior bad acts are never admissible is incorrect.

The question remains, however, whether the evidence was properly excluded pursuant to Rule 403. The district court engaged in an explicit analysis of whether to admit this prior assault evidence. It first determined that there was a significant risk of a mini-trial on the assault, since there was no prior conviction, and the only witnesses were Wicahpe and the victim. The court also viewed the probative value of the evidence as weak, since the defendant wanted to use the five-year-old assault by Bissonette, someone with whom he had remained close friends, to show that he feared Bissonette on the day of the stabbing. Thus, the court refused to admit this evidence.

We find Waloke to be instructive in this case. There, the defendant assaulted someone after a day of drinking. The defendant sought to introduce evidence that his victim had engaged in prior acts of violence. The district court refused the evidence because of concern that it would trigger "collateral mini trials" on the bad acts. Id. at 830. Instead, the court permitted the defendant to present evidence that the defendant had a reputation for violence, without reference to specific acts. Noting that the district court "has wide discretion in determining the admissibility of evidence," our court found no abuse of that discretion in excluding the prior act evidence. Id.

Similarly here, the district court refused to allow evidence of a specific violent act, but permitted evidence related to the victim's reputation for aggression and violence. Moreover, there were concerns about the temporal proximity of the prior assault, which occurred five years earlier. As the district court noted, its probative value on the issue of Wicahpe's fearful state of mind was minimal, considering that he and Bissonette had remained friends during the time between the assault on Ten Fingers and the stabbing. Further, the defense presented evidence that Bissonette had

engaged in two assaults on the very day of the stabbing, one of which was the brutal, violent attack on Wicahpe's father moments earlier. We question whether stale evidence of an adolescent assault would be anything more than cumulative considering the evidence that was actually admitted. Thus, we find no abuse of discretion in the exclusion of the assault evidence.

## III.   CLAIMS OF PROSECUTORIAL MISCONDUCT

### A.   Presentation of false testimony

Wicahpe first asserts that the government knowingly presented perjured testimony. The prosecution may not solicit perjured testimony to secure a conviction or allow testimony that it knows is false to remain uncorrected. United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995). To establish a constitutional violation arising from the use of false testimony, "the testimony must have been perjured, the government must have known it was, and there must have been a reasonable likelihood that the perjured testimony affected the jury's determinations." United States v. Boone, 437 F.3d 829, 840 (8th Cir. 2006) (citing Martin, 59 F.3d at 770).

Wicahpe directs us to three instances in which, according to him, the government presented "diametrically opposed testimony on several material facts." (Def.'s Br. at 43.) First, he states that while some witnesses said that Wicahpe looked and talked like he had been beat up by Curtis, Larry Bettelyoun, Sr. testified that no had fight transpired between Wicahpe and his father. Next, Wicahpe contends somebody must have lied about Bissonette's assault on Curtis, because Curry testified there was a fight, while Bettelyoun, Sr. stated it was an unprovoked attack. Lastly, a prosecution witness stated that Bissonette smoked marijuana that night, but Dr. Donald Habbe, who performed the autopsy, concluded from the toxicology report that Bissonette had not done so.

-10-

As to the first matter, Bettelyoun, Sr. testified about what he saw transpire between Curtis and Wicahpe, and others testified about their observations of Wicahpe <u>after</u> he had left Bettelyoun, Sr.'s house.  It is not inconceivable that Wicahpe had not fought with his father, yet appeared to his friends and acted as if he had, or more likely, that the extremely intoxicated Bettelyoun, Sr. simply had not seen or recalled the fight.  On the question of whether Curtis had been in a fight with Bissonette or simply attacked by him, Curry's version of the events is clearly not identical to Bettelyoun Sr.'s, but minor inconsistencies do not establish that the government knowingly presented perjured testimony.  The same can be said for Dr. Habbe's testimony.  When compared with witness Cory DeLeon, who said she had given Bissonette marijuana that night, there is an inconsistency.  While it is unusual that a toxicology report would not show the presence of marijuana if a person ingested it, we question both the materiality of this inconsistency and whether it could be considered the product of presenting knowingly perjured testimony.  We thus decline Wicahpe's invitation to conclude these inconsistencies require reversal.

## B.      Improper closing argument and rebuttal

Wicahpe next argues comments made by the government in closing argument and rebuttal were prejudicially improper.  The prosecutor suggested in closing that Wicahpe's defense attorney was trying to "mislead" the jury with the "red herring" evidence that Bissonette had brass knuckles on him the day of the stabbing.  (Trial Tr. Vol. II at 296, 320-21.)  The prosecutor also referred to his twenty-plus years of experience in the United States Attorney's office as giving him the insight that the facts are not what the lawyers say they are.  He followed this comment by again stating that Wicahpe's lawyer was pointing the jury to red herrings to "distract you[,] to take you off the path."  (<u>Id.</u> at 321.)  The prosecutor finally implored the jury not to let Wicahpe's lawyer "twist those facts" or "con you."  (<u>Id.</u> at 325-26.)

-11-

1.	Propriety of the comments

"To obtain a reversal for prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the defendant's rights in obtaining a fair trial." United States v. King, 36 F.3d 728, 733 (8th Cir. 1994). If we find the comments were improper, we consider the cumulative effect of the improprieties, the strength of the evidence against the defendant, and whether the district court took any curative action. United States v. Beckman, 222 F.3d 512, 526 (8th Cir. 2000). This analysis is altered in Wicahpe's case because his attorney did not object to the improper comments or move for a mistrial on this basis, and the district court took no curative action sua sponte. The error is thus unpreserved, United States v.Griffin, 437 F.3d 767, 769-70 (8th Cir. 2006), and we review for plain error, United States v. Olano, 507 U.S. 725, 731 (1993).

The author of this opinion has no hesitancy in finding the comments made by the prosecutor to be inappropriate. This court has previously admonished counsel for focusing personal attacks on defense counsel. In United States v. Lopez, 414 F.3d 954, 960 (8th Cir. 2005) (en banc), the district court sustained an objection to the prosecutor's reference to defense counsel's "slick tactics." Although we agreed that this comment alone did not warrant a mistrial, we noted that such conduct by a prosecutor was "improper." Id.; cf. United States v. Cannon, 88 F.3d 1495, 1502 (8th Cir. 1996) ("Referring to defendants as 'bad people' simply does not further the aims of justice or aid in the search for truth, and is likely to inflame bias in the jury and to result in a verdict based on something other than the evidence."). Similarly, in United States v. Holmes, 413 F.3d 770, 775 (8th Cir. 2005), our court reversed a conviction for prosecutorial misconduct where the prosecutor used closing argument and rebuttal "to focus on the conduct and role of [the defendant's] attorney rather than on the evidence of [the defendant's] guilt." The prosecutor in Holmes, as here, suggested that the defense attorney was distracting the jury with red herrings, and insinuated that the attorney and defendant had conspired to fabricate a defense. The Holmes

court found it "particularly disturbing" that the improper comments were made during rebuttal, when the defendant had no opportunity to respond. Id. at 776.

The government argues that if the prosecutor's comments were improper at all, they were fair, invited responses to the defendant's closing. I disagree. In Wicahpe's closing, he focused on the fact that Bissonette had brass knuckles. While the prosecutor might have considered this a red herring, it was central to Wicahpe's claim of self-defense, as he would feel the necessity to use more force if he knew or had reason to know that Bissonette used dangerous weapons. The government directs us to the vigorous, sometimes personal, argument made in Petan's closing. That, however, cannot excuse the prosecutor for comments directed at Wicahpe's lawyer.

2. Effect of any misconduct

Even where this court finds that the government has committed misconduct, we must determine its cumulative effect, the strength of the evidence against the defendant, and whether the district court cured any error. Beckman, 222 F.3d at 516. Although this analysis is altered slightly because we are reviewing for plain error, see United States v. Pirani, 406 F.3d 543 (8th Cir. 2005) (en banc) (stating plain error standard), both inquiries consider whether the defendant was substantially prejudiced by the error.

In this instance, we find the cumulative effect of the errors do not require reversal. As detailed more fully above, the government established that Wicahpe stabbed Bissonette in retaliation for Bissonette's attack on Wicahpe's father. Eyewitnesses testified that Wicahpe sought revenge upon seeing his father injured. He recklessly drove a vehicle at a high rate of speed until he reached Bissonette's location. Upon entering the residence, Wicahpe armed himself with a knife, broke the telephone, and after a short time, stabbed Bissonette. Wicahpe argues that Petan's acquittal shows that the evidence against him was weak, but the evidence presented

against Petan was quite different than the evidence presented against Wicahpe. Accordingly, although we find the prosecutor's comments improper, we nonetheless affirm Wicahpe's conviction.

## IV.   WICAHPE'S SENTENCE

Wicahpe lastly claims his 135-month sentence, which was the low end of his guidelines range, was unreasonable because his circumstances required a sentence outside the guidelines. Because our circuit has held that a guidelines sentence is "presumptively reasonable," United States v. Davidson, 437 F.3d 737, 741 (8th Cir. 2006) (citing United States v. Lincoln, 413 F.3d 716, 717 (8th Cir. 2005)), the burden is upon Wicahpe to show that the sentence should have been lower, considering the factors enumerated in 18 U.S.C. § 3553(a). He may do so by showing "the district court failed to consider a relevant factor that should have received significant weight, gave significant weight to an improper or irrelevant factor, or otherwise committed a clear error of judgment." Davidson, 437 F.3d 741.

We find nothing in the record to indicate that the district court committed error in imposing a guidelines sentence. The district court noted the seriousness of the offense, Wicahpe's age, history of substance abuse, and lack of criminal history. The court went on to specifically state that it believed a guidelines sentence was reasonable and appropriate given the § 3553(a) factors. We agree, and thus affirm the sentence.

## CONCLUSION

For the reasons stated above, we affirm the conviction and sentence in this case.

-14-

GRUENDER, Circuit Judge, with whom COLLOTON, Circuit Judge, joins, concurring in part and concurring in the judgment.

I concur in all of Judge Heaney's opinion, except Part III.B.1, and I concur in the judgment. I write separately because I respectfully disagree with the analysis in Part III.B.1 of Judge Heaney's opinion regarding the propriety of the prosecution's comments during closing argument and rebuttal.

"An advocate is permitted considerable latitude in responding to his opponent's arguments." *United States v. Beaman*, 361 F.3d 1061, 1065 (8th Cir. 2004) (quoting *United States v. Schwartz*, 655 F.2d 140, 142 (8th Cir. 1981) (per curiam)). First, taken in context, I find the prosecution's "red herring" comments, *ante* at 11, to be part of a proper argument asking the jury to reject Milk's self-defense argument. The prosecution argued in closing:

> Folks, that is an intentional killing. You are going to have to sift through this evidence, as I said. There's a lot of extraneous evidence. Ben Long Wolf. So he had a dispute with Arlen Bissonette's brother because he went with his girlfriend, or something. Honestly, what does that have to do with this? Does that in some fashion justify murdering this guy? Does it really have any pertinence to it? Don't decide this fact no matter how hard anybody comes up here and asks you to, this never had to happen. Had Wicahpe Milk and Petan Milk not gone over to Jr.'s house, they are on the fight, ready to murder, we wouldn't be here today. They could call the police; they could do any number of things that are legal, but they sure couldn't go over there and kill the guy.
>
> There's an old expression they call something a red herring. It's from detective novels. It's something to sort of take you off the trail, mislead you, keep you from focusing on what really happened. Kind of a false clue. Well, I would suggest to you that there's been a defense of red herrings here. We have heard hours of testimony about the assault on Curtis Milk. And you know there was an assault on him. He was

-15-

beat up. But it has nothing legally significant to do with what happened in this case, and with what is your duty as jurors in terms of the evidence that you need to consider. It was a separate event; it happened at a separate location; and again, could have been handled by the police; all they had to do was be called. Could have been not handled at all, not that I am saying that that should have been what happened, but it sometimes does. But what couldn't be done was retaliation.

Trial Tr. Vol. II at 296-97.

The prosecution returned to this theme during rebuttal:

When Ms. Thomas [Wicahpe's counsel] was speaking, she made a couple comments that I found interesting, one of which is that, well, people could have done different things all day long. Well, you know that's true. People could have done different things all day long and people did some things that day that they shouldn't have done. But none of those other people murdered anybody; none of those other people stabbed anybody with a knife; none of those other people nailed somebody over the head with a club. Yeah, they did some things they shouldn't have, but that's not what is before you today. As I said before, you get these red herrings, things to distract you to take you off the path, take you away from the facts in the case. But you heard the facts in the case and there's no question, there's no question whatsoever but that Petan Milk and Chops [Wicahpe] Milk came into that house, came into Larry Junior's house, came in there to kill Arlen Bissonette, and did so.

Trial Tr. Vol. II at 320-21.

In contrast to the prosecutorial comments we held to be improper in *Holmes* and *Lopez*, I do not think the "red herring" comments here can be fairly read as attempts to cast aspersions on defense counsel. In *Holmes*, the prosecution repeatedly referred to the defense counsel by name with statements such as "Mr. Moss needs to make sure that they get their stories straight," and once called defense counsel's

-16-

arguments "red herrings." 413 F.3d at 775. We explained why these comments were improper:

> We think that these various comments referring personally to Mr. Moss and the necessity for Mr. Moss to "get his stories straight," taken as a whole and in the context of the rebuttal argument, show that the government attorney was accusing defense counsel of conspiring with the defendant to fabricate testimony. These types of statements are highly improper because they improperly encourage the jury to focus on the conduct and role of Mr. Holmes's attorney rather than on the evidence of Mr. Holmes's guilt. Such personal, unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case.

*Id.*

Unlike *Holmes*, the prosecution in the instant case did not repeatedly refer to defense counsel by name or imply that defense counsel had conspired to fabricate evidence. Rather, the prosecution referred to defense counsel by name just once, and then only to agree with a statement made by defense counsel. Although the term "red herring" was used both in *Holmes* and in the instant case, the implication of the term here was not that defense counsel fabricated evidence, but rather that focusing on the murder victim's assault of Wicahpe's father was not a basis to find Wicahpe innocent of murder. I certainly agree with Judge Heaney, *ante* at 12-13, that it was a valid strategy for the defense to focus on the brass knuckles found in Bissonette's possession after his death and the wounds on Curtis Milk's face and to ask the jury to conclude that Wicahpe feared a dangerous weapon. However, it was equally valid for the prosecution to argue to the jury that what happened to Curtis did not excuse the killing of Arlen Bissonette. Finding no "personal, unsubstantiated attacks on the character and ethics of opposing counsel," *Holmes*, 413 F.3d at 775, nor any accusations of "slick tactics," *Lopez*, 414 F.3d at 960, in these "red herring" comments by the prosecution, I do not find them to be improper.

-17-

Next, in rebuttal closing argument, the prosecution referred to 23 years of experience in the U. S. Attorney's Office. While it can be a risky practice for the prosecution to cite personal experience to bolster an argument, our precedent does not suggest that the reference to experience was improper in this instance. In *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989), for example, the prosecution stated during closing argument, "Don't you think over the years of experience we have picked up a little bit of sense of what rings true in a criminal investigation and what rings true in a case?" After examining the context of that statement, we held that "the government's arguments were within permissible limits and did not imply that the government possessed knowledge concerning facts not in evidence." *Id.* In the instant case, the prosecutor stated that his 23 years of experience taught him that "the Judge instructs you on the law" and "facts are what you hear from the witnesses up on the witness stand, not from the lawyers saying what the facts are." Trial Tr. Vol. II at 320. In referring to his experience, the prosecutor was emphasizing two fundamental precepts governing jury trials, not implying the possession of knowledge concerning facts not in evidence. Therefore, I would not find the prosecution's reference to his experience to be improper in this instance.

Finally, I find that the prosecution's closing references to defense counsel's alleged attempt to "twist those facts" and "con you," Trial Tr. Vol. II at 325-26, fall closer to the line demarcated by *Holmes* and *Lopez*. Although the phrase "con you" in particular can carry some pejorative connotations,[3] in context these comments were also part of an argument to the jury to reject the defense's invitation to dwell on evidence that was extraneous to the prosecution's theory of the case. Because the

---

[3]The verb "con" can mean "swindle" or "manipulate," as well as the less pejorative "persuade, cajole." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2005).

comment here was fleeting and ambiguous and passed without an objection that might have clarified it, I would not find it to be improper in this case.

In conclusion, I do not find the challenged comments by the prosecution to be improper when taken in context. Therefore, I would not reach the question of whether the comments prejudiced the defendant's rights in obtaining a fair trial. *See*

*King*, 36 F.3d at 733. Accordingly, while I agree that these comments would not be grounds for reversal even if improper, I respectfully disagree with Judge Heaney's analysis in Part III.B.1 regarding the propriety of the prosecution's comments in closing argument and rebuttal.

_____