BYE, Circuit Judge,
dissenting.
If the jury in Gregg’s murder trial had before it evidence of specific instances of the victim’s violent conduct in order to explain Gregg’s state of mind at the time of the shooting, evidence his trial counsel failed to offer, there is “a reasonable probability ... the result of the proceeding would have been different.” Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). I therefore respectfully dissent.
I
Before discussing why I disagree with the majority’s legal analysis, I believe it is necessary to more thoroughly describe the two specific instances of the victim’s violent conduct which Gregg seeks to admit in a new trial. Only a thorough description of the two incidents, when compared to the marginal state-of-mind evidence Gregg was allowed to introduce in his murder trial, demonstrates why the failure to introduce the evidence prejudiced Gregg’s theory of self defense.
*947 A. The Boat Dock Incident
In the summer of 1999, James Fallís (the victim) had an altercation with one of Gregg’s cousins and two wildlife conservation officers which garnered notoriety in the community and well demonstrated Fallis’s violent propensities. Gregg heard about the incident from his father and grandfather, as well as neighbors, friends, and other relatives. The incident started when Fallís spun his vehicle in tight circles (commonly referred to as donuts or cookies) near a boat dock in the Lake Sharpe area of the Missouri River. The vehicle’s tires spit gravel on a number of people gathered in the area. A female wildlife conservation officer was present and confronted Fallís about his behavior. Fallís went into a fit of rage after being challenged by the female officer, and took after her as she walked away. Gregg’s cousin, Todd Cowan, was present at the boat dock area with his children. Cowan intervened to stop Fallís from attacking the female officer. Fallís then retreated to his vehicle, retrieved a large tire iron, and returned to attack Cowan with the tire iron.
Before Fallís could hit Cowan with the tire iron, a second wildlife conservation officer, Leon Leuning, positioned himself between the two men. Leuning’s description of Fallis’s behavior (both in an interview occurring prior to the original trial and then again at the evidentiary hearing in this proceeding) is especially telling. Leuning said Fallís raised the tire iron above his head in a menacing fashion and moved toward Cowan. Fallis’s speech was incomprehensible. He was frothing at the mouth and “blowin’ snot and spit” and “totally out of control.” App. at 115. His eyes were out of focus. Leuning believed Cowan was in imminent danger. Leuning drew his weapon and ordered Fallís to drop the tire iron several times. Fallís was between six and twelve inches from the barrel of Leuning’s gun, which was pointed directly at Fallis’s face. Even with a gun in his face, Fallís was in such a rage that he continued his attempts to hit Co-wan with the tire iron. Leuning finally told Fallís to drop the weapon or he would “blow his head off.” Id. at 236. Fallís finally dropped the tire iron, and Leuning placed him in handcuffs. Leuning opined that Fallís had “psychopathic tendencies” and an “explosive violent temper” and went “ballistic when he got pissed.” Id. at 118, 120.
B. The Longbranch Saloon Incident
In 2003 or 2004, Gregg’s father told him' about another incident involving Fallís. Fallís got into an altercation with a couple inside the Longbranch Saloon in Pierre, South Dakota. A bouncer at the bar ordered all three to leave the bar, then witnessed what happened when the three were outside. Outside the bar, Fallís wanted to fight with the man. The man did not want to fight, and he and his girlfriend got into their car. Fallís would not let them leave. When the man tried to back out of the parking lot, Fallís jumped on the hood of the car, banging his fist on the hood and the windshield. As a result of what the bouncer witnessed, the Long-branch Saloon banned Fallís from the bar for life. This reinforced Gregg’s impression that he should stay away from Fallís because Fallís would not let anyone get away from a fight even if they wanted to back down. At the evidentiary hearing in this habeas proceeding, Gregg stated “once [Fallís] had his eyes locked on you, he was going to — he was going to follow through with it no matter what the task.” Id. at 174.
In addition to these two specific instances, Gregg had additional knowledge of Fallís which affected his state of mind on the night he shot Fallís. His knowledge of Fallís dated back to his own childhood *948 when Fallís would bully Gregg’s sister and other young children on the school bus, and when Fallís got kicked out of school due to his behavior. Gregg knew about a fight between Fallís and another boy over a girl where the girl “took off and hid behind the trees because it was so violent.” Id. at 164. Because Fallís had a violent temper and never backed down, Gregg “always wanted to stay on his good side” and did not want to be “viewed as a threat to him or anything of that nature.” Id. at 160.
At the evidentiary hearing, Gregg explained how his knowledge of Fallis’s violent approach to confrontations affected his state of mind at the time of the shooting:
I was precluded from saying exactly why I was afraid of him, why I was scared of him. If I could have given these instances that I knew of before, the way he acted that night, I mean, the way he come after me, the way he had this temperament about him, the look in his eyes — I mean, if you could have seen all of that that night and you would have known these past experiences from him, I mean, it would have been like the greatest fear in your life coming alive right in front of you. I mean there’s no getting around it. There is — this guy was going to kill me.
When he turned, he made the motion that he was going to get a gun out of the trunk of his car. I mean, at that point, everything that I’ve heard about him, you know, what I just seen from him that moment, I mean, I was so scared. I mean, I’ve never been so scared in my life. This is something over the top of what I even experienced over in Iraq. I mean, this guy was going to kill me because I was trying to defend myself. And the only way I could keep him from getting me out of that truck was to pull a gun. And I wanted him to back away, and I said that. He backed up and he made the further threat. “Oh, you want to fu-- with guns? Well I got guns.” And he ran right to the trunk of his car. I had to stop him. I couldn’t let him get to the trunk of his car. I had to stop him. There was no getting out of the situation. I was in a dead-end road. I couldn’t back up. There was no lights. There’s people all around me. There was no way I could get out of there. I couldn’t let him get a gun out of the trunk and shoot me.
He’s never been known to back down out of a fight. He’s — all of the instances that I’ve known — I mean, he attacks a park ranger with a tire iron, you know. He’s coming after him. He comes after Todd with a tire iron just because he stops him, you know, from attacking a woman. He won’t let a person leave a fight at the Longbranch. I mean all these instances, it just clicked right then and there, you know. I’ve had all these feelings about him, you know, wanting to stay away from him, you know, as much as I could and be on his good side, you know. And it all drops dead right there, and he comes right after me, you know. There’s no way I could — he was just— he’s vicious. If you could see it in his eyes, I mean, you would have known. You would have seen his body movements, the way he acted, his threatening speech, you know, everything, how he was — his face, the motions he was going through. I mean, I wish everyone else could have seen it because then they would have — they would have understood me.
Id. at 180-83.
II
At his original trial, Gregg was only allowed to acknowledge he was scared of Fallís. That was the limit of the state-of- *949 mind evidence heard by the jury. Gregg was never given the opportunity to explain why he was scared, and without such an explanation, he was essentially denied the right to present a claim of self defense. When Gregg tried to proffer evidence he was scared of Fallís because Fallís was “tough,” the trial court did not even allow that limited explanation of Gregg’s state of mind:
Defense Counsel: Were you scared of [Fallís] at all?
Prosecutor: I’m going to object, Your Honor.
The Court: Overruled.
Gregg: Just wanted to stay on the good side, yeah.
Defense Counsel: Why was that?
Gregg: Just because they’re tough and—
Government: I’m going to object. They—
The Court: Sustained. The answer is stricken. The jury should disregard that.
App. at 578.
The right of an accused to present a defense is well established as a fundamental element of due process. See, e.g., Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). If the jury had been presented with meaningful evidence of Gregg’s state of mind, it may very well have concluded he “unreasonably but truly believed that deadly force was necessary to defend himself,” and thus did “not have the requisite mens rea to be guilty of second-degree murder.” United States v. Milk, 447 F.3d 593, 599 (8th Cir.2006). State of mind evidence is particularly critical in self defense cases because “the crux of [the] defense rest[s] on [the defendant’s] credibility.” United States v. James, 169 F.3d 1210, 1215 (9th Cir.1999).
The majority concludes there is no reasonable probability the result of the proceeding would have been different if the jury had heard Gregg’s state of mind evidence, but even assuming there is doubt on that issue, Gregg failed to prove he was prejudiced because “the trial court likely would have excluded the evidence under Rule 403 or 404(b).” Ante at 945. I disagree. First of all, what this trial court likely would have done is irrelevant under a proper Strickland analysis. In denying Gregg’s § 2255 motion, the district court (who was also the trial court who presided at the original murder trial) concluded the outcome of the case would not have been different, even if trial counsel had offered evidence of the victim’s prior violent conduct, because it would have excluded the evidence in any event. United States v. Gregg, No. CR 04-30068, 2010 WL 3003235, at *4 (D.S.D. July 30, 2010). The district court based its decision on its own propensities regarding evidence offered under Federal Rule of Evidence 404(b). See id. at *3 (“As stated, my practice has been for years to rarely admit such evidence because I believe it often violates Fed.R.Evid. 403.”).
It was improper for the district court to consider its own propensities in assessing whether Gregg was prejudiced by his trial counsel’s failures. “The assessment of prejudice ... should not depend on the idiosyncraeies of the particular decision-maker, such as unusual propensities toward harshness or leniency.” Strickland, 466 U.S. at 695, 104 S.Ct. 2052. “[A] particular judge’s ... practices should not be considered in the prejudice determination.” Id. Rather, “[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.” Id. Applying Strickland’s standard, I do not believe a reasonable, conscientious and impartial decisionmaker would have excluded the two specific instances of Fallis’s *950 violent conduct because the evidence was critical to Gregg’s state of mind at the time of the shooting, and critical to his due process right to present a claim of self defense.
To be admissible under Rule 404(b), the two incidents had to be “similar in kind and close in time to the event at issue” and “supported by sufficient evidence to support a finding by the jury that the act[s] occurred.” United States v. Chase, 451 F.3d 474, 479 (8th Cir.2006). If admissible under Rule 404(b), the two incidents should not have been excluded unless their “probative value [was] substantially outweighed by the danger of unfair prejudice.” “When evidence is offered to prove state of mind [under Rule 404(b) ], we presume that the evidence is admissible for that purpose.” Chase, 451 F.3d at 479. “A district court abuses its discretion if evidence of a critical nature is excluded and there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted.” Harris v. Chand, 506 F.3d 1135, 1140 (8th Cir.2007) (internal quotation marks and citation omitted).
I believe the two incidents were similar in kind and close enough in time that they should have been admitted. Although the boat dock incident occurred roughly five years before Gregg shot Fallís, the incident occurred when Fallís was an adult and reflected the manner in which he conducted himself as an adult during a confrontation. Fallis’s behavior at the boat dock was similar to Gregg’s version of the events on the night of the shooting, in that Fallís retreated to his vehicle only to return armed with a deadly weapon and ready to attack, despite being threatened with a deadly weapon himself. Officer Leuning’s description of Fallis’s demeanor at the boat dock (i.e., incomprehensible speech, “totally out of control,” his eyes out of focus) was similar to Gregg’s description of Fallis’s demeanor on the night of the shooting (i.e., the look in his eyes, his threatening speech, his body movements). The Longbranch Saloon incident was also similar in that it reflected Fallis’s unwillingness to walk away from a confrontation without resorting to violent behavior.
This case stands in stark contrast to Milk, where a five-year-old incident of the victim’s violent conduct was excluded because the defendant and victim had become close friends in the meantime, “which suggested [the defendant] was not scared of [the victim].” 447 F.3d at 597. Here, Gregg testified he had always been afraid of Fallís, trying to be friendly only out of necessity “to stay on his good side” so as not be viewed as a threat specifically because Fallís was such a violent person. In addition, there was no evidence that Fallis’s violent approach to confrontations had changed at all in the five years between the boat dock incident and the shooting, as demonstrated by the more recent incident at the Longbranch Saloon.
The meager, almost non-existent evidence Gregg was allowed to offer at his trial regarding his state of mind did not satisfy his due process right to present a claim of self defense. If the jury had been given a clear picture of Gregg’s knowledge of the violent, explosive, and out of control manner in which Fallís conducted himself during a confrontation, it may well have decided Gregg truly believed he needed to use deadly force to defend himself on the night of the shooting, even if his belief was unreasonable. I would therefore reverse the judgment of the district court, and grant Gregg a new trial.
For the reasons stated above, I respectfully dissent.