# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3558
_____

United States of America

*Plaintiff - Appellee*

v.

Joseph Thompson, Sr.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Central
_____

Submitted: October 25, 2024
Filed: April 3, 2025
_____

Before LOKEN, SMITH, and GRASZ, Circuit Judges.
_____

SMITH, Circuit Judge.

A jury convicted Joseph Thompson, Sr., of voluntary manslaughter, in violation of 18 U.S.C. §§ 1153 and 1112. On appeal, Thompson challenges his conviction, arguing that insufficient evidence supports the jury's verdict and that the

district court[1] erred in denying Thompson's proposed self-defense jury instruction. We affirm.

## I. *Background*

"We recite the facts in the light most favorable to the jury's verdict." *United States v. Galloway*, 917 F.3d 631, 632 (8th Cir. 2019) (internal quotation marks omitted).

One evening, Thompson was visiting Charmayne Grooms at her home in Lower Brule, South Dakota. Grooms was "walking the floor" to calm her baby when Thompson, who was on Grooms's bed in her bedroom, told Grooms that "somebody's knocking or pounding on your window." R. Doc. 48-1, at 98. Grooms responded, "Oh f**k, that's probably Marty [LaRoche]." *Id.* LaRoche was "[t]he father of [Grooms's] kids." *Id.* at 59. Thompson stood up from the bed and exited the room. Two locked doors separated him from outdoors. Grooms did not tell Thompson that she was afraid of LaRoche, nor did she ask Thompson to go outside and confront LaRoche or to protect her from him.

As Thompson was leaving the bedroom, LaRoche managed to get the bedroom window open. He yelled inside, "Open the f***in' door, Charmayne; open the f***in' door." *Id.* at 99. He said he wanted Grooms to open the door because he knew someone was in the room with her. Grooms saw LaRoche through the window. Grooms, still holding her baby, turned around and left the bedroom.

Grooms took her baby to her roommate, Marialan Langdeau, and said, "Here, they're going to fight." *Id.* at 102. Langdeau, however, refused to take the baby.

---

[1]The Honorable Roberto A. Lange, Chief Judge, United States District Court for the District of South Dakota.

Langdeau "want[ed] nothing to do with it." *Id.* Langdeau also believed that LaRoche would not be violent with Grooms if she was holding the baby.

Grooms went outside the home, with her baby still in her arms. Grooms "peeked around" the corner of the house and "saw Marty [LaRoche] lying on the ground" in the area near her bedroom window. *Id.* at 103. She then saw LaRoche "getting up." *Id.* at 104. She also saw Thompson "[w]alking away" from the residence. *Id.* Grooms said to Thompson, "What the f**k did you do, Joseph?" *Id.* Thompson replied, "He was trying to fight me; he was trying to fight me." *Id.* at 105. Thompson continued walking away and said nothing else to Grooms.

Grooms ran back in the house, gave the baby to Langdeau, and asked her to call the police. When Grooms went back outside, she saw LaRoche "coming around [her] car." *Id.* As LaRoche got closer, Grooms noticed blood "[a]ll over" him. *Id.* at 106. He had "blood all over his face, all over his abdomen." *Id.* The "[b]lood [was] everywhere." *Id.* LaRoche "stagger[ed] on[to] the porch and . . . barely caught himself on the rail." *Id.* LaRoche appeared to be "com[ing] at [Grooms]." *Id.* at 107. In response, Grooms "was going to turn around and take off back running inside" when she "noticed and realized all the blood[,] so [she] [went] towards him." *Id.* She said, "Come here, Marty," and "grabbed him." *Id.* They collapsed on the porch together. Langdeau was outside at this point. Grooms told Langdeau, "Hurry up, he's going to die, he's going to die." *Id.* In response, Langdeau, who had seen LaRoche come up the porch toward Grooms and noticed LaRoche bleeding, called the police. Grooms unsuccessfully performed CPR on LaRoche.

T.L., a juvenile, witnessed some of the incident while shooting his BB gun from his treehouse. According to T.L., he had a view of Grooms's backyard from his treehouse. A streetlamp was lighting the area. T.L. heard arguing coming from Grooms's house, which caused him to look over in that direction. T.L. saw "two men" arguing—"a big guy and a little guy." *Id.* at 149. T.L. then saw "the big guy punch

the little guy" about "five" times. *Id.* at 150. T.L. did not "see the little guy punch the big guy." *Id.* at 149. T.L. saw the little guy "stumbl[e] backwards" after the "big guy punched [him]." *Id.* at 150. After the little guy "fell to the ground," T.L. saw "the big guy" "[w]alk[] away." *Id.* T.L. also observed a woman exit the house and the little guy get up and go towards her. T.L. heard the woman yelling at the little guy to "stay awake." *Id.* at 152.

Bureau of Indian Affairs (BIA) Officer Conway Betone received a notice from dispatch reporting LaRoche's stabbing at Grooms's residence. Upon arrival, Officer Betone saw Grooms waving for him to hurry up. Officer Betone saw LaRoche lying on the porch. Grooms, who was crying, shaking, and trembling, "told [Officer Betone] that Marty LaRoche got stabbed by Joseph Thompson." R. Doc. 48, at 25. Officer Betone was unable to find a pulse. He observed a lot of blood. He called for assistance and began CPR. Officer Betone continued CPR until emergency medical technicians (EMTs) arrived and took over LaRoche's care. After LaRoche was loaded into the ambulance, Officer Betone secured and photographed the scene. He found a storm window removed from the bedroom window where LaRoche was shouting at Grooms. Additionally, he found a blood trail that began in the grass near the bedroom window and continued up to the porch where LaRoche's body was located. Officer Betone secured the scene until BIA Special Agent Kory Provost arrived.

The EMTs performed lifesaving measures on LaRoche throughout transport to the hospital. These measures required removal of LaRoche's clothing. One of the EMTs recalled that the clothing felt heavy and made a "heavy metal thud" when he placed it on the ground. *Id.* at 73. As the EMTs were cleaning the ambulance, another EMT found a heavy bag among LaRoche's clothing. She opened it and found a firearm inside. She brought the bag into the hospital and informed the nurse that the bag contained a gun. The gun was unloaded. LaRoche was pronounced dead almost immediately upon arrival to the hospital.

Thompson was indicted by a federal grand jury and charged with one count of second-degree murder, in violation of 18 U.S.C. §§ 1153 and 1111. Thompson proceeded to a jury trial.

At trial, Dr. Kenneth Snell, a forensic pathologist, testified about the autopsy that he performed on LaRoche. Dr. Snell discussed his findings, including that LaRoche had "a toxic level of methamphetamine" in his system. R. Doc. 48-1, at 20. Dr. Snell also testified about the six stab wounds and two incised wounds that he documented on LaRoche's body. Dr. Snell opined that LaRoche's "cause of death" was from "the stab wound to the left chest involving the left lung and left heart." *Id.* at 25. Dr. Snell also noted that "this wound . . . result[ed] in a fracture of left fifth rib." *Id.* at 24.

Samantha Shaw, a forensic scientist, testified as to the DNA and serology testing that she conducted. Shaw testified that she was able to develop a DNA profile for all blood swabs sent to her for testing and that the DNA profile matched LaRoche. According to Shaw, she also tested the recovered firearm for the presence of blood and did not find any evidence of blood on it.

Prior to the government resting at trial, the court discussed the preliminary draft final jury instructions with counsel. Defense counsel requested a self-defense instruction based on South Dakota law. The court indicated that its "inclination [was] to draw the self-defense or defense[-]of[-]others instruction from the federal [law]," R. Doc. 48-2, at 8, given that 18 U.S.C. § 1111 "defines second degree murder and . . . it's a federal offense not a state offense," *id.* at 7.

After the close of the government's evidence, the defense moved for judgment of acquittal. Thompson argued that "there is no reasonable view of the evidence which would lead one to believe that . . . malice aforethought . . . is there." *Id.* at 32. The district court denied the motion. It concluded that

the question about malice aforethought . . . [is] a jury question in that two of the stab wounds were of such force that [LaRoche sustained] fractured ribs as they enter[ed] and are to the body cavity with depth that could and in fact did cause death and the lone independent witness . . . testified that he only saw the bigger guy . . . hitting the little guy . . . five times.

*Id.* at 34.

After both sides rested, the court discussed with counsel "Instruction 11[, which] is the federal self-defense or defense[-]of[-]others instruction" and whether the court "should [instead] give an instruction based on the South Dakota statute known as the stand-your-ground law." *Id.* at 47–48. Instruction 11 provides as follows:

> If a person reasonably believes that force is necessary to protect himself or others from what he reasonably believes to be unlawful physical harm about to be inflicted by another and uses such force, then he acted in self-defense or in defense of others.

> However, self-defense or defense of others that involves using force likely to cause death or great bodily harm is justified only if the person reasonably believes that such force is necessary to protect himself or others from what he reasonably believes to be a substantial risk of death or great bodily harm.

R. Doc. 37, at 12. By comparison, Thompson proposed the following self-defense instruction based on South Dakota law:

> In South Dakota, any person is justified in using deadly force if that person reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or any other person, or to prevent the imminent commission of any forcible felony.

-6-

Any person who uses deadly force under this defense does not have any duty to retreat and has the rights to stand his ground, so long as he is not engaged in criminal activity and is in a place he has a right to be.

Any person is presumed to have a reasonable fear of imminent death or great bodily harm to himself or any other person if that person is defending against someone who was in the process of unlawfully entering a dwelling or residence and the person using defensive force knew or had reason to believe that an unlawful entry or an unlawful and forcible act was occurring or had occurred.

Any person who unlawfully enters or attempts to enter a person's dwelling or residence is presumed to be doing so with the intent to commit an unlawful act involving force or violence.

A person who has been attacked and who is exercising the right of lawful self-defense is not required to retreat, and may not only defend against the attack but also may pursue the assailant until secure from danger if that course appears to the defendant, and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary; and this is the defendant's right even if safety may have been more easily gained by withdrawing from the scene.

R. Doc. 19-1, at 14–15.

After hearing argument from counsel, the court decided to give Instruction 11 over the defense's requested South Dakota self-defense instruction. But the court acknowledged "loose language in *United States v. Greer*, 57 F.4th 626 [(8th Cir. 2023)]." R. Doc. 48-2, at 52. In *Greer*, this court stated, "In criminal trials, federal courts usually look to state law to define the elements of self defense." 57 F.4th at 629. The district court noted that *Greer* contained "[n]o citation" to support the proposition. R. Doc. 48-2, at 52. "Instead," the court noted, "the Eighth Circuit in that paragraph cites to *United States v. Milk*[, 447 F.3d 593, 598 (8th Cir. 2006),] where

the self-defense definition given is the instruction the [district] [c]ourt has." *Id.* Additionally, *Greer* cites to *United States v. Tunley*, 664 F.3d 1260, 1262 n.3 (8th Cir. 2012), "which does not say that federal courts are to look to state law, but rather, says in addressing self-defense claims to murder charges under 18 United States Code §1111(a), 'Courts have traditionally relied on the common law definition of self-defense.'" *Id.* (quoting *Tunley*, 664 F.3d at 1262 n.3 (citing *Milk*, 447 F.3d at 598)). Finally, *Tunley* cites to *Brown v. United States*, 256 U.S. 335, 343 (1921), "which is a Supreme Court case which contains language . . . akin to the Eighth Circuit pattern instruction." *Id.* at 52–53. "[G]iven the awkwardness of this fact scenario and application to the state stand-your-ground statute, and the authority resisting and cited in *Greer*, and the concern of uniformity in application of federal statutes," the district court "conclude[d] that the proposed instruction from [Thompson] drawing from portions of the state statute of stand-your-ground should be refused." *Id.* at 53.

The jury ultimately found Thompson guilty of the lesser-included crime of voluntary manslaughter. The district court sentenced Thompson to 128 months' imprisonment.

## II. *Discussion*

On appeal, Thompson challenges the sufficiency of the evidence and the district court's denial of his proposed self-defense jury instruction under South Dakota law. We begin with the latter issue.

### A. *Self-Defense Jury Instruction*

Thompson argues that the district court abused its discretion in denying his proposed self-defense instruction under South Dakota law. *See United States v. Farlee*, 757 F.3d 810, 816 (8th Cir. 2014) ("We generally review a district court's refusal to provide a requested instruction for abuse of discretion." (internal quotation

marks omitted)). As he did before the district court, he relies primarily on *Greer* to support his argument. *Greer*, however, is unavailing.

In *Greer*, the defendant, who was convicted of being a felon in possession of ammunition after he shot a victim in a convenience store, appealed the district court's application of the attempted first-degree murder cross-reference in the Guidelines. 57 F.4th at 628. The defendant argued that he shot the victim in self-defense. *Id.* We affirmed the district court's application of the attempted first-degree murder cross-reference, holding that "[t]he district court did not clearly err in finding 'there is absolutely no evidence of self-defense.'" *Id.* at 630. In support of its holding, this court stated:

> "Self-defense as a justification for killing is not codified by federal statute, but is instead a 'basic right, recognized by many legal systems from ancient times to the present day.'" *United States v. Tunley*, 664 F.3d 1260, 1262 n.3 (8th Cir. 2012), quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010). *In criminal trials, federal courts usually look to state law to define the elements of self defense.* These laws may vary but almost universally provide that "self defense which involves using force likely to cause death or great bodily harm is justified only if the person reasonably believes that such force is necessary to protect himself or another person from what he reasonably believes to be a substantial risk of death or great bodily harm." *United States v. Milk*, 447 F.3d 593, 598 (8th Cir. 2006).

*Id.* at 629–30 (emphasis added).

*Tunley*, which *Greer* cited, also involved application of the Guidelines. In that case, the defendant pleaded guilty to being a felon in possession of a firearm. 664 F.3d at 1261. The presentence investigation report recommended application of a cross-reference to the defendant's offense level based on the defendant's "possession

of the firearm in connection with another felony offense where death resulted." *Id.* The defendant objected, arguing that he acted in self-defense under Missouri law. *Id.* After the district court concluded that the cross-reference applied, the defendant appealed. *Id.* at 1262. In *Tunley*, we discussed whether Missouri's self-defense law should be considered in analyzing the defendant's claim of self defense. We concluded that it was unnecessary to resolve because the facts did not support its use. *Id.* at 1262 n.3 ("Because we find that Tunley's claim of self-defense under the Missouri statute is not supported by the facts, we decline to address the more complex issues of due process and federalism that might otherwise be implicated by Tunley's reliance on Missouri's self-defense statute.").

In *Milk*, the defendant, as in this case, was charged with second-degree murder under 18 U.S.C. §1111. 447 F.3d at 597. After his conviction, Milk appealed, contending that he should have been acquitted because self-defense motivated his actions. *Id.* at 598. Milk did not seek an alternative to the district court's use of the Eighth Circuit Model Jury Instruction 9.04, which provides:

> If a person reasonably believes that force is necessary to protect himself or another person from what he reasonably believes to be unlawful physical harm about to be inflicted by another and uses such force, then he acted in self defense or defense of another person.
>
> However, self defense which involves using force likely to cause death or great bodily harm is justified only if the person reasonably believes that such force is necessary to protect himself or another person from what he reasonably believes to be a substantial risk of death or great bodily harm.

*Id.*; *see also* Eighth Cir. Model Crim. Jury Instr. § 9.04 (same).

In some cases that our district courts have used Model Instruction 9.04, we have held that those courts were not required to give the defendant's proposed

-10-

instruction on self-defense that included a no-retreat principle. Two very relevant cases involved defendants who were charged with federal offenses; in both cases, the defendants sought instructions that expressed that they were not required to retreat and that the aggressor did not have to be armed for the defendant to assert self-defense as an affirmative defense. *See Farlee*, 757 F.3d at 818; *United States v. Earth*, 984 F.3d 1289, 1299 (8th Cir. 2021). In *Farlee*, we held that district court was not required to give the defense's requested no-retreat principle because it was adequately set forth in the model jury instruction given by the district court. 757 F.3d at 818. Similarly, in *Earth*, we held that the district court did not abuse its discretion by rejecting the defendant's requested jury instruction that "[a] person acting in self-defense is not required to retreat before resorting to the use of force." 984 F.3d at 1299. The Eighth Circuit Model Jury Instruction given in the defendant's trial for federal offenses "provided the jury with an adequate and correct instruction as to [the defendant's] theory that self-defense justified her actions." *Id.* at 1299–300.

We hold that the district court did not abuse its discretion in rejecting Thompson's proposed self-defense instruction under South Dakota law. On this record, it within the court's discretion to provide the jury with the Eighth Circuit Model Jury Instruction on self-defense. First, *Greer* said that "federal courts *usually* look to state law to define the elements of self defense," meaning that principle does not apply to every case. 57 F.4th at 629 (emphasis added). Second, *Greer* was a Guidelines case that ultimately held that there was no evidence of self-defense by the defendant; it did not involve the use of self-defense to a federal charge to second-degree murder, like *Milk* did. *Milk* makes clear that "the common law definition of self-defense" applies to "self-defense claims to murder charges under § 1111(a)." *Tunley*, 664 F.3d at 1262 n.3 (citing *Milk*, 447 F.3d at 598). Fourth, in *Milk*, *Farlee*, and *Earth*, we upheld the same model self-defense instruction that the district court gave here; like the defendants in those cases, Thompson was charged with a federal offense.

B. *Sufficiency of the Evidence*

Thompson argues that the government failed to prove beyond a reasonable doubt that he did not act in self-defense in the stabbing death of LaRoche. *See United States v. Chase*, 451 F.3d 474, 479 (8th Cir. 2006) ("For [the defendant] to be convicted of voluntary manslaughter, the government had to prove beyond a reasonable doubt that [the defendant]: (1) voluntarily, intentionally, and unlawfully killed [the victim]; (2) acted in the heat of passion caused by adequate provocation; and (3) *was not acting in self defense*." (emphasis added)).

"We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Washington*, 318 F.3d 845, 852 (8th Cir. 2003). "[O]nly if no reasonable jury could have found the defendant guilty beyond a reasonable doubt" will we reverse. *Id.* "It is the function of the jury, not an appellate court, to resolve conflicts in testimony or judge the credibility of witnesses. Its determinations are virtually unreviewable on appeal." *United States v. Cavanaugh*, 30 F.4th 1139, 1144 (8th Cir. 2022) (internal quotation marks and citation omitted). And "in reviewing a defendant's challenge to the sufficiency of the evidence, witness testimony does not need to be corroborated." *United States v. Perez*, 663 F.3d 387, 391 (8th Cir. 2011) (cleaned up).

Here, the jury was unable to reach a verdict as to the crime charged in the indictment, second-degree murder. The jury did, however, convict Thompson of the lesser-included offense of voluntary manslaughter. *See* R. Doc. 38; *see also Chase*, 451 F.3d at 479 (elements of voluntary-manslaughter offense). Thompson challenges the final element of the offense, arguing that the government failed to prove beyond a reasonable doubt that he did not act in self-defense. *See Chase*, 451 F.3d at 479.

"Although a federal defendant bears the burden of production on the issue of self-defense, once that burden is met, the government must prove beyond a reasonable

doubt that the defendant did not act in self-defense." *Milk*, 447 F.3d at 598. The government does not dispute that Thompson satisfied his burden of production; as a result, the question is whether sufficient evidence exists from which a reasonable juror could conclude that Thompson was not acting in self-defense or defense of others.

Thompson asserts that the evidence established that "[LaRoche], irate, armed with a firearm, and under the influence of methamphetamine, forcibly removed the storm window to [Grooms's] bedroom window, opened the window, reached inside to pull the window treatment aside, and screamed at [Grooms] to open the door." Appellant's Br. at 16. According to Thompson, Grooms feared LaRoche "because she had been in an abusive relationship with [him], knew [him] to be jealous, and believed [he] had seen [Thompson], whom [LaRoche] hated." *Id.* Thompson knew that Grooms was afraid of LaRoche because she had previously told Thompson about the abuse. Thompson maintains that he "went outside and ultimately stabbed [LaRoche] and told [Grooms] that he had done so because [LaRoche] was trying to fight him." *Id.* He points out that "[n]obody witnessed how the fight started" and that, as a result, "the government failed to disprove self-defense beyond a reasonable doubt." *Id.*

But viewing the evidence in the light most favorable to the jury's verdict, we conclude that the government satisfied its burden to prove that Thompson was not acting in self-defense. First, the government produced evidence that Thompson was inside Grooms's home when LaRoche began pounding on the bedroom window. At no time did Grooms tell Thompson that she was afraid of LaRoche, nor did she ask Thompson to go outside and get rid of LaRoche or to protect her from LaRoche.

Second, Thompson went outside to confront LaRoche and had to unlock two doors to get outside to reach LaRoche. After exiting the house, he proceeded to the side of the house, where the altercation with LaRoche occurred.

-13-

Third, T.L.—the only witness to the actual alteration—testified that he heard arguing coming from Grooms's house, which caused him to look over in that direction. T.L. saw "two men" arguing—"a big guy" (Thompson) and "a little guy" (LaRoche). R. Doc. 48-1, at 149. T.L. then saw "the big guy punch the little guy" about "five" times. *Id.* at 150. T.L. did not "see the little guy punch the big guy." *Id.* at 149. T.L. saw the little guy "stumbl[e] backwards" after the "big guy punched [him]." *Id.* at 150. After the little guy "fell to the ground," T.L. saw "the big guy" "[w]alk[] away." *Id.* T.L. also observed a woman exit the house and the little guy get up and go towards her. T.L. heard the woman yelling at the little guy to "stay awake." *Id.* at 152.

Fourth, Thompson stabbed LaRoche multiple times, fracturing two of LaRoche's ribs when stabbing him. The two thrusts that fractured LaRoche's ribs also pierced his left lung, heart, spleen, and stomach.

Fifth, Grooms testified that when she went outside, she walked to the corner of the house and observed LaRoche lying on the ground close to her window. She observed LaRoche getting up and Thompson walking away. Thus, as the government points out, "Thompson did not stay to ensure [Grooms], or her children, were safe." Appellee's Br. at 17.

Sixth, it was not until later in the evening that an EMT discovered that LaRoche had a handgun in his possession. The EMT testified that she was cleaning her ambulance and she found a heavy bag in LaRoche's clothing, which was closed. The EMT found a handgun in the bag when she opened it. It was determined that the gun was unloaded. Forensic analysis also determined that there was no blood on the unloaded firearm. No evidence was presented that Thompson knew that LaRoche had any firearm, loaded or unloaded, in a closed bag, under his clothing. An autopsy was also performed that showed that LaRoche had a toxic level of methamphetamine in

his system at the time of his death. But there was no evidence that Thompson was aware of this fact when he stabbed the victim repeatedly.

In summary, "the evidence established that Thompson was the person who left the safety of a locked residence, approached [LaRoche], brandished a weapon, and proceeded to stab" LaRoche multiple times. *Id.* at 18. Construing all reasonable inferences in light of the jury's verdict, we hold that sufficient evidence exists that Thompson was not acting in self-defense.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____