# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-1929

_____

United States of America

*Plaintiff - Appellee*

v.

John Michael Riepe

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: January 13, 2017
Filed: May 31, 2017

_____

Before WOLLMAN, MURPHY, and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

John Michael Riepe was convicted by a jury of one count of attempted enticement of a minor in violation of 18 U.S.C. § 2422(b). The district court[1] sentenced him to 151 months' imprisonment. He appeals, arguing that the evidence

_____

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

was insufficient to convict him of the charged offense and that the district court erred in admitting evidence of his prior bad acts under Federal Rule of Evidence 404(b). We affirm.

## I. Background

On September 17, 2014, a letter addressed to "[MB], a very special student" was delivered to a high school in Bettendorf, Iowa. MB was a female student who was then fifteen years old. The letter was signed "John Riepe" and listed no return address. It explained that Riepe had met MB at the Bettendorf YMCA some eight or nine months earlier but had not seen her since. He described his appearance and enclosed a picture of himself. The letter invited MB to contact Riepe, using the phone number set forth therein. The letter went on to state that Riepe might attend MB's sporting events or otherwise "see [her] around." MB recalled at trial that Riepe had approached her at the YMCA, that the two had exchanged small talk, and that she might have seen him there on one other occasion.

After MB showed the letter to her parents, they took it to the police. A check of the police department's computer system revealed that Riepe was thirty years old and lived near a high school in Davenport, Iowa. With the permission of MB and her parents, Detective Rachelle Kunde of the Scott County Sheriff's Office, a member of the Iowa Internet Crimes Against Children Task Force, began sending text messages to Riepe at the number he had provided, purporting to be MB.[2]

---

[2]Kunde used a service that allowed her to exchange messages with Riepe from either her computer or a cell phone and which made the messages appear to come from a real phone number. In the following summary of the messages exchanged between Kunde and Riepe, we quote the messages as they originally appeared, including misspellings and abbreviations. For simplicity's sake, we refer to Kunde as the person sending and receiving text messages, but in all of the messages described below she purported to be MB.

Kunde and Riepe began exchanging text messages on September 22, 2014. After Kunde told Riepe that she had received his letter, Riepe suggested that the two exercise together again, stating that he "missed [his] [MB]." Riepe stated that "its nice to b able to talk to a rational girl for [once] and your so hot." Kunde then complimented Riepe's appearance and said, "U know wht is super cool? that u don't treat me like a kid bcuz im 15!" Riepe asked when he could see her again and suggested that he attend her sporting events. Kunde responded that they could not meet at school or otherwise be seen together.

On September 26, Kunde texted Riepe, "hey! what u doin?" Riepe replied that he was watching television and thinking about MB. Riepe stated, "Gosh I love u lol !" ("lol" means "laugh out loud" in text-message speak). On September 27, Kunde declined Riepe's offer to go "[h]aunted housing." On September 28, Riepe texted that he was thinking of MB, that she made him smile, and that "U look so good walkn arnd the weight room."

On September 29, Riepe texted "[MB] lol ! ; ) ." He told her that he had pulled a groin muscle while running. He asked how MB got home from school. Kunde replied that sometimes her mother picked her up and sometimes she rode with friends. Riepe then asked, "Do u live far," to which Kunde did not respond.

On October 3, Riepe texted, "Thinking of u : ) hope you had a great week TGIF !" Riepe disclosed that he had driven past MB's high school the previous day, and said, "i really like u as a fr[iend]. . . . Or a gf [girlfriend]." Kunde replied, "U would want me as yur gf??" Riepe responded, "Sure... But seriously your great." He asked if they could meet soon and attend a movie or go to a haunted house. Kunde responded that she would try. Riepe offered to give MB a ride home from school, but Kunde declined, noting that she did not want her mother or anyone else to see them together. Riepe stated, "I cant wait ; ) i was never cut lol," which, he later explained, meant that he had not been circumcised. According to Riepe, this would result in

"more pleasure for both."  He later told her, "U are the best [MB] ... I love you."  Kunde  replied, "Love u 2."  Riepe stated, "Well we cn c eachother whnevr your ready."

On October 10, Riepe texted, "[MB] : ) ."  After Kunde replied that she had thought Riepe had forgotten about her, Riepe responded "I thnk abt u all the time." Riepe's October 16 text said that he was thinking of MB and that he did so daily. When asked about the nature of his thoughts, he replied, "sexually lol! Just u in general I cant wait to c u again."  Kunde asked, "U think about sex w me? :) ."  Riepe answered, "Its possible lol !"   Kunde then texted, "Ok :) I didn't think u would wanna do that stuff w me lol."  Riepe replied, "I find u sexually attractive."

Kunde told Riepe that she had not had sex before, but that she would do so if Riepe wanted to.  Riepe replied, "Alright."  In response to her inquiry as to where they could have sex, Riepe said that they could do so at his house or a hotel room. When Kunde expressed concern that she would not know what to do, Riepe told her, "Lol ! U wld b fine...we dnt have to do it right away we cn go c a movie first or whtever." Kunde requested that Riepe use a condom because she did not want to risk becoming pregnant.  Riepe asked MB not to get him into trouble.  She replied that she would not.  Riepe stated, "I feel rly horny rght nw."  After Kunde asked when he wanted to have sex, Riepe replied, "Its up to u...ths wknd?"  Kunde said that she could not meet over the weekend, but that she was available either that night or the following week.  Riepe replied that they should meet the following week and that they should also visit haunted houses together.  Riepe then discussed masturbation and described the size of his penis.  He asked whether MB had seen pornography and whether she enjoyed oral sex.  He also stated, "technically your almost legal Rly 16" and that when they met, they could "do whtever haunted housing or . . . . We can go back to my place right away ; ) ." When Kunde asked if Riepe had had sex with girls her age before, he replied that she would be the first.

On October 21, Riepe asked if MB would like to visit haunted houses on Thursday or Friday, October 23 or 24. Kunde responded, "yea that b cool maybe like Thursday! :) ." Riepe then stated, "Perfect...i cant wait to c u and give u a hug i havent felt a woman in so long : ( lol ! Seriously Though !"

On October 23, Riepe asked what Kunde's plans were that night. She told him that she could not meet him that night. Riepe again told her that he thought about her every day. When Kunde asked in what way he thought about her, he replied, "U your attitude and how things are going and sexually ; ) ." Kunde asked, "Really? That's cool..u still wanna do stuff w me sexual then?" Riepe answered, "Oh for sure if u do." Riepe stated that he had wanted to have sex with MB the previous year, after their first conversation, but that he was not sure at the time if he should ask. In response to questions by Kunde, Riepe explained that they could have sex at his house and that she should ask her mother for permission to be gone for a few hours. Kunde again asked if Riepe would use a condom, and he said that he would. Riepe asked if MB wanted to meet him the following day. Kunde said that she wanted to and would ask her mother if she could go out with friends.

On October 24, Riepe asked Kunde how her day was going. She responded that she could not meet with him that night because her grandmother was visiting, but stated that she could meet with him the following week. When Riepe asked if she was still single, she replied that she thought Riepe was her boyfriend. Riepe told her that he was. He stated that he wanted to cuddle with her and was looking forward to the following week.

On October 25, Riepe texted Kunde that he was "deprived" because he had gone his whole life without talking to a girl like her, saying that, "i cld sure use u rght abt nw ; ) ." After Kunde asked what he meant, he said "Lol ! from like 5 a.m. till nw [at 10:41 AM] sometimes i gt very hard ; ) ." Kunde replied, "Oh!!! Lol," and then, "U like mean to b w me and do it." Riepe replied, "Perhaps," then, "Lol ! Yeah thats

wht I meant :) ," and then, "Anal." Kunde asked, "Really? Would that hurt tho?" Riepe answered, "Lol ! Maybe u wld have to take it slow...do u evn like it." Kunde replied, "Not sure guess I could try." Riepe then stated, "I love hw u talk to me i am so horny rght nw." Kunde asked, "Next week right?" and Riepe replied, "Yes." He then asked her to touch herself and boasted about the strength of his sperm, saying that he would have to wear a condom to prevent her from becoming pregnant.

On October 27, Riepe asked if Kunde still wanted to visit a haunted house with him later that week. She stated that she would ask her mother if she could go out on Thursday, October 30. On October 28, Kunde told Riepe that her mother had said she could go to a friend's house on Thursday. Riepe said they needed to spend some time together and asked her to give him a shoulder massage.

On October 29, Riepe texted to confirm their plans for Thursday or Friday. Kunde responded that she planned to meet him on Thursday. Riepe stated that he was nervous about their meeting "due to lack of companionship," because he had not had a girlfriend in a long time. Kunde asked him, "u don't wanna?" He replied, "No i do will cme back to my house first." He told her, "We cn watch sme scary movies before we go haunted housing lol ! And u knw : ) if u want." Kunde replied, "yea i still wanna if u do." She asked if Riepe had condoms. They planned to meet near a church the next day.

At 9:18 A.M., October 30, Kunde asked if Riepe had received her message regarding the church where they planned to meet. At 1:35 P.M., Riepe replied that he was out of town but would be home soon. Kunde asked, "Ok do u still wanna do it then or no?" Riepe replied, "Yea do u ? I thnk hauntd houses dnt open till like 7." He stated, "Im actly rly hard rght nw lol !" and told her, "lol ! Its up to u we cn just go out later if u wnt we dnt have to unless our hormones take over ; ) ." They agreed that Riepe would pick her up at 5:00 P.M, with Riepe later stating that he might not arrive at the meeting place until 5:30 and that he would be driving a red Toyota. At

-6-

5:34 P.M., Riepe told her that he was on his way and asked her to look up the locations of haunted houses. Kunde asked, "We still goin yur house first," and Riepe answered, "Yes." At 5:58 P.M., Riepe told Kunde that he had arrived at the church parking lot. Kunde told him she would walk over to meet him and that she would be wearing a pink sweatshirt.

After officers observed Riepe drive to the agreed-upon location and park, they arrested him. They found no condoms on Riepe's person, in his vehicle, or in his house.

The district court denied Riepe's pretrial motion to exclude evidence that Riepe had previously approached two other teenage girls and instructed the jury to consider this evidence only for the purpose of establishing Riepe's plan, knowledge, and preparation regarding his contact with MB and not for the purpose of establishing his propensity to commit similar acts.

AM testified that in 2013 Riepe had approached her at the grocery store where she worked as a cashier. Riepe asked her her age and did not believe her when she said she was seventeen, so she showed him the birth date on her driver's license. A few months later, Riepe went to AM's register to buy one item, which AM found odd because there were two customers ahead of him with large orders. After making his purchase, he told AM, "Well, I haven't seen you in a while." Five or ten minutes later, Riepe again waited in AM's checkout line to purchase a single item. He asked AM when she would be done with work. She falsely stated that her shift ended shortly, because she did not want Riepe to continue coming through her checkout line. After AM returned from a break, she was told that a man had been looking for her. That same evening, Riepe again entered the store and went through AM's checkout line. AM told him that he was making her uncomfortable, and he asked to speak to her manager, who spoke with Riepe in a different room. AM subsequently

filed a police report about Riepe. Two or three weeks later, AM saw Riepe outside her high school on school property and called the police.

RV testified that in October 2013, when she was a seventeen-year-old high school senior, she received a friend request from Riepe on a social network website. She accepted the request because it appeared that she and Riepe had mutual friends on the website. She testified that Riepe might have learned that she was a cheerleader for her school's football team from a picture on her social network web page. Riepe sent RV a private message stating something to the effect of: "Thank you for accepting my friend request. I'm glad not everyone's a stranger. I'm excited to go see you cheer. I'll be at the Assumption versus Central game. I'll come over to the Central side at half time. You'll notice me. I seem to stand out in a crowd." Recognizing that Riepe's web-page picture showed that he was older than high school age, RV responded, "I don't know you. Please don't contact me." A friend of RV saw Riepe at the game and told RV's parents, who contacted the police. Police officers escorted Riepe out of the stadium. RV thereafter saw Riepe looking in from outside the stadium's gate. Riepe subsequently came to RV's high school, purportedly to discuss the interaction at the football game, following which he was banned from all Davenport School District properties, including the attached YMCA buildings. RV also testified that Riepe called her home phone on two occasions.

## II. Discussion

### A. Sufficiency of the Evidence

"We review the sufficiency of the evidence supporting a conviction de novo, 'viewing the evidence most favorably to the verdict, resolving conflicts in favor of the verdict, and giving it the benefit of all reasonable inferences.'" United States v. Muhlenbruch, 634 F.3d 987, 1000 (8th Cir. 2011) (quoting United States v. Spencer, 592 F.3d 866, 876 (8th Cir. 2010)). "We must uphold a jury's verdict if 'there is an

interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt.'" Id. To convict a defendant of enticement of a minor, the government must prove beyond a reasonable doubt that the defendant: "(1) used a facility of interstate commerce, such as the internet or telephone system; (2) knowingly used the facility of interstate commerce with intent to persuade or entice a person to engage in illegal sexual activity; and (3) believed that the person he sought to persuade or entice was under the age of eighteen." United States v. Shinn, 681 F.3d 924, 931 (8th Cir. 2012) (quoting United States v. Young, 613 F.3d 735, 742 (8th Cir. 2010)). "Attempt requires an intent to commit the predicate offense and conduct that is a substantial step towards the crime's commission." Id.

Riepe argues that the evidence was insufficient for the jury to find that he possessed the requisite intent to persuade MB to engage in sexual activity. He contends that the text messages described above demonstrate that he was interested in spending time with MB, but that it was Kunde who pursued the topic of sex, while Riepe suggested other activities, such as visiting haunted houses. We disagree. Riepe persistently pursued MB, repeatedly told her how attractive she was, and told her that he loved her and that she was his girlfriend. Riepe was first to broach the topic of sex, telling MB that he had not been circumcised and that this would produce "more pleasure for both." He repeatedly told her when he felt sexually aroused, he discussed specific sex acts that he would like to perform with her, and he stated that they could have sex at his house. He ultimately arranged to meet her, arrived at the specified location, and confirmed shortly before the meeting that they would go back to his house.

This evidence was more than sufficient to support the jury's conclusion that Riepe intended to persuade MB to have sex with him. See id. at 931 ("In attempted enticement of a minor cases, the defendant's intent can be inferred when the defendant has online conversations of a sexual nature with a minor." (quoting Young, 613 F.3d at 742)); see also id. (holding that the requisite intent was

-9-

established where the defendant "engaged in sexually explicit chats, described the sexual acts he wanted to perform, placed a phone call to the putative victim, arranged for an in-person meeting at a motel, carried a note with [the putative victim's] name and contact information, and traveled to the hotel, carrying condoms and recording devices"). Moreover, even if some of Riepe's messages indicated that he did not intend to have sex with MB immediately after their meeting, the evidence would still be sufficient to demonstrate his intent despite such a willingness to delay the sexual activity.

Riepe argues that his failure to purchase condoms despite having agreed to Kunde's multiple requests that he use one indicates his lack of intent to engage in sex with MB. Kunde testified that multiple stores near the church sold condoms, and thus Riepe's nonpossession of condoms at the moment of his arrest was a matter for the jury to take into consideration in determining whether he had such intent.

## B. Rule 404(b) Evidence

We review the admission of evidence under Rule 404(b) for abuse of discretion. United States v. Mora, 81 F.3d 781, 782 (8th Cir. 1996). Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evidence is admissible under Rule 404(b) if it satisfies the following requirements:

> (1) the evidence of the bad act or other crime is relevant to a material issue raised at trial; (2) the bad act or crime is similar in kind and reasonably close in time to the crime charged; (3) there is sufficient evidence to support a finding by the jury that the defendant committed

-10-

the other act or crime; and (4) the potential prejudice of the evidence does not substantially outweigh its probative value.

Mora, 81 F.3d at 783; see also Fed. R. Evid. 403 (allowing the court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of," *inter alia*, "unfair prejudice"). "This Court has consistently construed Rule 404(b) as a rule of inclusion, precluding only evidence that is relevant solely to the defendant's character." United States v. Aranda, 963 F.2d 211, 215 (8th Cir. 1992). We will reverse the admission of evidence under Rule 404(b) only when it "clearly has no bearing upon any of the issues involved." Id. (citation omitted).

The district court recognized that "404(b) evidence is always a difficult one, I think, for both sides." It continued,

> In this case I have done the analysis that is recommended by the Eighth Circuit and I do find that evidence regarding Defendant's contacts with A.M. and R.V. and his presence at the various locations from which he'd been banned that were frequented by minors . . . slightly more than a year before this charged conduct is relevant to show his planning, his knowledge, his preparation with respect to the contact that later happens with M.B.

The district court went on to say, "I do find this evidence is similar in kind and not overly remote to the crime charged; that it appears to be supported by sufficient evidence, . . . and I find that it does have a higher probative value than prejudicial effect. So I will allow the 404(b) evidence as outlined by the Government . . . for the purpose of showing Defendant's plan, knowledge and preparation."

Riepe argues that the evidence of his contacts with AM and RV did not relate to any element of the charged offense because it did not show that he broached the topic of sex with either girl. True enough, but the fact that Riepe contacted these two teenage girls, unbidden, and continued to do so over their objections, gives rise to an

-11-

inference that his intent in contacting them was to persuade them to become involved in other than a platonic relationship with him. Thus, that evidence was relevant to show that Riepe's intent in contacting MB was to persuade her to engage in sexual activity, and it was unquestionably relevant to his planning, his knowledge, and his preparation for his later contact with her. Cf. United States v. Hensley, 574 F.3d 384, 388-90 (7th Cir. 2009) (holding that evidence of defendant's prior online sexual conversations with a minor was relevant to rebut the defendant's claim that he did not believe the putative victim to be a minor); United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006) (holding that images of child pornography on defendant's computer were relevant to his intent to entice a minor to engage in sexual activity). We thus conclude that the district court did not abuse its discretion in admitting the evidence for those purposes. Likewise, we conclude that those acts were sufficiently similar in kind to the conduct involving MB. See Mora, 81 F.3d at 783 ("[T]he prior acts need not be duplicates of the one for which the defendant is now being tried, because the admissibility of other crimes evidence depends on the nature and purpose of the evidence." (internal quotation marks and citations omitted)).

We reject Riepe's argument that the evidence should have been excluded under Rule 403 because its probative value was outweighed by a danger of unfair prejudice. "Reversal is appropriate only if the trial court failed to engage in the required balancing process or when it is impossible to determine from the record whether it did or not. It is sufficient if we can discern from the record that the trial court performed the requisite balancing." United States v. Pierson, 544 F.3d 933, 941 (8th Cir. 2008) (citation omitted). As set forth above, it is clear from the record that the district court engaged in the Rule 403 balancing analysis and found that the evidence had higher probative value than prejudicial effect. Moreover, the jury was correctly instructed to consider the evidence only as it related to Riepe's plan, knowledge, and preparation. See United States v. Lindsey, 702 F.3d 1092, 1099 (8th Cir. 2013) ("The presence of a limiting instruction diminishes the danger of any unfair prejudice

-12-

arising from the admission of other acts." (quoting United States v. Halk, 634 F.3d 482, 488 (8th Cir. 2011))).

In any event, any error in admitting the evidence regarding AM and RV was harmless. "An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'" United States v. Crenshaw, 359 F.3d 977, 1003-04 (8th Cir. 2004) (quoting United States v. Carroll, 207 F.3d 465, 470 (8th Cir. 2000)). The limiting instruction diminished the danger of unfair prejudice. Moreover, the evidence of Riepe's intent to have sex with MB was overwhelming. See United States v. Turner, 781 F.3d 374, 391 (8th Cir. 2015) ("Given the extent and nature of the evidence presented against the defendants, however, if there was any error in the admission of this [prior-convictions] evidence, that error was harmless."); United States v. Tarnow, 705 F.3d 809, 815 (8th Cir. 2013) (holding that any error in admitting evidence of physical abuse of defendant's former wife was harmless "in light of the overwhelming evidence against [defendant] and the limiting instruction given to the jury"). Accordingly, we conclude that the introduction of the evidence regarding AM and RV did not have a "substantial and injurious effect or influence in determining the jury's verdict." Turner, 781 F.3d at 391 (quoting United States v. Mejia-Uribe, 75 F.3d 395, 399 (8th Cir. 1996)).

The judgment is affirmed.

_____