# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-3447
_____

United States of America

*Plaintiff - Appellee*

v.

Casey Lynn Crow Ghost

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Northern
_____

Submitted: June 16, 2023
Filed: August 17, 2023
_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.
_____

ERICKSON, Circuit Judge.

A jury convicted Casey Lynn Crow Ghost ("Crow Ghost") of first-degree murder, in violation of 18 U.S.C. §§ 924(d), 1111, and 1153, and use of a firearm during a crime of violence that caused death, in violation of 18 U.S.C. § 924(d) and

924(j)(1). The district court[1] sentenced Crow Ghost to serve two concurrent life terms of imprisonment. Crow Ghost appeals, asserting the district court committed four errors during trial: (1) when it allowed the government to present evidence under Federal Rule of Evidence 404(b) of Crow Ghost's jealous behavior toward two other men; (2) when it denied his motion for judgment of acquittal, finding the government had presented sufficient evidence of premeditation; (3) when it *sua sponte* failed to instruct the jury on imperfect self-defense; and (4) when it denied Crow Ghost's request to instruct the jury on involuntary manslaughter. We affirm.

## I.    BACKGROUND

Crow Ghost and his girlfriend, Allison Archambault, had a sometimes tumultuous relationship. Archambault's family enlisted the help of law enforcement when they were unable to contact Allison for several days. On December 15, 2020, a Bureau of Indian Affairs officer went to Crow Ghost's apartment in Mclaughlin, South Dakota. Six or seven of Archambault's family members escorted the officer to the rear of Crow Ghost's apartment and pointed to blood on the ground and back door. After radioing dispatch, the acting chief of police directed the officer to contact tribal housing for access into the apartment to conduct a welfare check.

When the officer stepped inside Crow Ghost's apartment, he almost immediately sensed the odor of a decaying body. Entering the kitchen area, the officer found Archambault face down on the floor surrounded by blood and wearing only one shoe. Archambault's other shoe was found at the threshold between the living room and the bedroom, and her cell phone was located on the kitchen table with a bloody fingerprint. No weapons were found near the body. While Crow Ghost was not inside the apartment, his car was parked in front of neighbor Leslie Confer's residence. Additional officers were summoned to help search for Crow Ghost. When the officers asked Confer and her son if Crow Ghost was inside, they

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

responded that they did not believe Crow Ghost was present. Confer consented to a search of her residence and officers found Crow Ghost hiding in the dark behind the bathroom door.

At 3:20 a.m. on December 16, 2020, Federal Bureau of Investigation agents interviewed Crow Ghost. Crow Ghost told the agents that he began drinking with Archambault at noon on Friday, December 11, 2020, and continued drinking with her on Saturday. After an argument erupted, Archambault threw things at him, called him names, hit him, tried to pull off his glasses, pulled his hair, grabbed two knives from a kitchen draw, and threatened to kill him. Crow Ghost claimed Archambault went to his bedroom closet to get a .45 caliber Sig Sauer pistol that Crow Ghost had purchased two months earlier. Archambault inserted the clip in the firearm, cocked it, and told Crow Ghost she hated him and wished he was dead. A struggle ensued, the gun went off, and Archambault fell to the floor, unresponsive. Crow Ghost indicated the shooting happened sometime around 5:00 p.m. on Saturday, December 12, 2020. Scared, Crow Ghost left the apartment with the firearm and drove around, eventually stopping and staying the night at his cousin's house. When agents told Crow Ghost that Archambault was dead, Crow Ghost reported that Archambault had been abusive toward him, and he acted in self-defense. Crow Ghost did not have any obvious injuries. Crow Ghost explained he had had no contact with Archambault after the shooting because he believed Archambault and a friend had gone to California. At the end of the interview, Crow Ghost told the agents where the gun was located, and he gave a sample of his DNA.

During the search of Crow Ghost's apartment, agents did not find any knives out of place. In Crow Ghost's bedroom, they found a bloody pair of pajama pants rolled up on the floor. They also found a cardboard box in the closet containing, among other things, a handgun magazine.

One week later, law enforcement interviewed Crow Ghost a second time. Crow Ghost stated that he did not tell the truth during his first interview. Crow Ghost told the agents during this interview that after Archambault had threatened

him with knives, he pushed Archambault away, took a gun from the kitchen counter, aimed the gun at her, and shot Archambault because she said she wanted to kill him. Before this interview, one of the agents had discussed with Crow Ghost the difference between premeditated murder and murder during the heat of passion so Crow Ghost wanted to clarify that he had shot Archambault in the heat of passion. Crow Ghost also reported that, after the shooting, Archambault was bleeding and trying to leave and use her phone when he grabbed her arm and escorted her back into the apartment.

At trial, the forensic pathologist who conducted an autopsy of Archambault's body testified that Archambault died of a single gunshot wound to the back of the head near the right ear area. The pathologist opined that Archambault sustained "a distant wound" to her head, meaning it was inflicted back-to-front from at least three feet away, as there was no gunshot residue or stippling on her head. The pathologist also observed bruising on the back of Archambault's hands. A DNA expert testified that the blood on Crow Ghost's apartment door was likely from Archambault. The gun contained blood on the front sight, which consisted of both male and female DNA. According to the expert's testimony, it was "equally likely" that Crow Ghost was the contributor to the male DNA as an unknown source and "very strong support" that Archambault was the contributor of the female DNA when compared to an unknown source. Two magazines were tested—one from the gun and one found in a closet—and only Crow Ghost's fingerprints were found on the magazines.

Prior to trial, the government gave notice of its intent to present evidence under Rule 404(b) of the Federal Rules of Evidence. The notice summarized the "other act" evidence of Crow Ghost's jealous behavior that the government intended to present through testimony of Archambault's friend Joseph Ybarra. The notice indicated that Ybarra would testify about being suddenly assaulted by Crow Ghost while walking outside at his girlfriend's residence on October 13, 2020. During the assault, Crow Ghost accused Ybarra of sleeping with Archambault. The government asserted the evidence was relevant to issues of intent and motive. The Rule 404(b) notice was amended eight days later to include additional testimony from another

-4-

one of Archambault's male friends—Douglas Moser. Moser told the government that he was romantically interested in Archambault, and he had planned to travel to Arizona with Archambault the weekend she was killed. Moser was expected to testify that in 2018 or 2019 he had offered to give Archambault a washing machine and Crow Ghost called Moser on the phone, swore at him, and told Moser that Archambault did not need a washing machine and to leave Archambault alone. The government asserted the evidence was admissible under Rule 404(b) to show motive, intent, lack of accident, and absence of mistake.

The district court issued a pretrial ruling to counsel on the Rule 404(b) evidence indicating: (1) it would allow the introduction of statements Crow Ghost made to Ybarra on October 13, 2020, but not any reference to physical violence; and (2) it would allow statements Crow Ghost made to Moser about the washing machine and directions to leave Archambault alone. The jury heard evidence consistent with the district court's ruling.

Crow Ghost testified in his own defense. At trial, he provided a third version of the events leading to the shooting. He testified that on the day Archambault died, Archambault accused him of having a sexual relationship with others, including her sister, and she attacked him in the kitchen. According to this version, as Crow Ghost tried to fend off Archambault, they ended up falling in the living room and continued wrestling. They both eventually got up and moved toward the backdoor when Archambault attempted to grab for knives along the way. They pushed each other outside and Crow Ghost asserts Archambault head-butted him on the side of his face. The pair ended up back inside the living room and, according to Crow Ghost, Archambault then walked into his bedroom, opened the closet, and retrieved a box from his closet which at one time had contained a gun. While Archambault was rummaging through the box, Crow Ghost grabbed the gun, which was still inside the closet. As they wrestled in the bedroom, one of Archambault's shoes came off. Crow Ghost decided the best thing for him to do was leave. But according to Crow Ghost, once Archambault saw that Crow Ghost had gotten his car keys and was walking out the back door, Archambault grasped his hair and pulled him back inside

the apartment. Crow Ghost grabbed his gun and when Archambault tried to take the gun away from Crow Ghost, it discharged, causing Archambault to fall on the threshold of the backdoor. Crow Ghost dragged the unresponsive Archambault inside the apartment so he could close and lock the backdoor. Crow Ghost changed out of his bloody pajama pants, took his dog, and drove toward Mobridge, eventually arriving in Kenel at his dad's house where he stayed the night. Crow Ghost told the jury that when he left his apartment after the shooting, he assumed Archambault was dead.

According to Crow Ghost, he left his dad's house the next morning and drove "aimlessly" until eventually returning to McLaughlin sometime on Tuesday. Crow Ghost claimed that he did not have a key to get back inside his apartment because Archambault had taken his only key to have a duplicate made. Crow Ghost drove to neighbor Confer's house because she had a spare key for his apartment. When he arrived at her house, Confer asked for a ride to the grocery store so Crow Ghost left with Confer without going into his apartment.

Following the guilty verdicts, Crow Ghost moved for a judgment of acquittal and for a new trial. The district court denied the motions, determining there was sufficient evidence for a jury to find beyond a reasonable doubt that Crow Ghost intentionally killed Archambault with malice aforethought and premeditation. According to the district court, direct evidence of premeditation included: (1) the purchase of the gun close in time to the offense; (2) Archambault was killed after Crow Ghost twice demonstrated jealousy over Archambault's interaction with other men; (3) when Archambault retrieved the gun from the closet; and (4) the moment Crow Ghost pulled the trigger. The district court outlined the circumstantial evidence supporting premeditation, which included: (1) the abusive nature of Crow Ghost's and Archambault's relationship; (2) Crow Ghost's previous confrontation with Moser; (3) Archambault's intention to take a trip with Moser the weekend Crow Ghost killed her; (4) while Crow Ghost had lived in his apartment for many years without a gun, he purchased a gun, at most, two months before the shooting; (5) after shooting and rendering Archambault unresponsive, Crow Ghost left her body in his

apartment for several days; (6) Crow Ghost did nothing to summon aid for Archambault, nor did he call law enforcement to report the shooting; and (7) Crow Ghost gave inconsistent statements in an attempt to conform to the evidence that was mounting against him.

The district court found there was no version of the evidence under which Crow Ghost voluntarily shot Archambault in the back of the head but did not intend to kill her, and the jury acted within its discretion in rejecting his theory of self-defense. Similarly, the court denied Crow Ghost's motion for a new trial, concluding there was no error in the jury instructions. Crow Ghost appeals.

## II.    DISUSSION

### 1.    Evidence Admitted Under Rule 404(b)

Crow Ghost contends a new trial is warranted because the district court abused its discretion when it admitted Moser's and Ybarra's testimony about his jealous behavior. Crow Ghost raises three issues with the Rule 404(b) evidence: (1) the notices were untimely; (2) the notices failed to satisfy the requirements of the rule; and (3) the evidence was unduly prejudicial. Crow Ghost contends that without the evidence the jury would only have heard his testimony, which points to a *mens rea* less than premeditation.

The government maintains that it provided reasonable notice when one considers the contested evidence consisted of two brief interactions involving Crow Ghost and Crow Ghost had an opportunity to cross-examine the two witnesses about their potential biases or faulty memories. Rule 404(b) imposes no specific time limits beyond requiring reasonable pretrial notice. United States v. White, 816 F.3d 976, 984 (8th Cir. 2016). Reasonable notice under the rule is a flexible standard dependent largely on the circumstances of each case. United States v. Green, 275 F.3d 694, 701 (8th Cir. 2001). Factors a court is to consider when determining the reasonableness of the notice are: (1) when, through timely trial preparation, the

government could have learned of the evidence; (2) the prejudice to a defendant due to the lack of time to prepare; and (3) the significance of the evidence to the government's case. United States v. Lindsey, 702 F.3d 1092, 1097 (8th Cir. 2013).

Here, the initial Rule 404(b) notice was given 22 days before trial and the notice was amended 14 days before trial. The evidence consisted of two brief interactions that Crow Ghost had with two other men. Crow Ghost did not seek a continuance upon learning of the anticipated testimony. He had the opportunity to, and did, file pretrial objections to the introduction of the evidence. In addition, the entire combined testimony of Ybarra and Moser was only a very brief facet of the case—less than 7 out of a total of 304 pages from the trial transcript. Crow Ghost chose to waive his right to cross-examine Moser. Ybarra testified that Crow Ghost approached him angry and upset and accused him of having a sexual relationship with Archambault. During cross-examination, Crow Ghost suggested the encounter happened because Archambault sent Crow Ghost to collect money Ybarra owed Archambault. Crow Ghost reiterated his theory when he took the stand and told the jury that he approached Ybarra to let him know that Archambault was upset, and Ybarra needed to start paying Archambault for bills that were due. Crow Ghost specifically denied accusing Ybarra of having a relationship with Archambault. Crow Ghost also denied knowing or talking to Moser, testifying: "I don't know Doug Moser. I certainly don't know his phone number."

A review of the trial transcript demonstrates that the 404(b) evidence was extremely brief and limited, Crow Ghost had an opportunity to cross-examine the witnesses, and Crow Ghost attempted to discredit their testimony when he took the stand and offered a different explanation. On this record, Crow Ghost has not shown that the three-week notice given for the Rule 404(b) evidence was so inadequate that he suffered any prejudice, let alone sufficient prejudice to warrant reversal of the jury's verdict. See White, 816 F.3d at 984 (concluding that notice given one week before trial was reasonable under the circumstances of that case). Given the circumstances of this case, we find no notice problem.

Crow Ghost next contends the government's Rule 404(b) evidence failed to satisfy the requirements of the rule because it was not "similar in kind" to the charged offense. Rule 404(b) is a rule of inclusion. United States v. Riepe, 858 F.3d 552, 560 (8th Cir. 2017). We review the district court's admission of evidence under the deferential abuse of discretion standard and will reverse only if the Rule 404(b) evidence "clearly had no bearing on the case and was introduced solely to show defendant's propensity to engage in criminal misconduct." United States v. Walker, 428 F.3d 1165, 1169 (8th Cir. 2005).

Contrary to Crow Ghost's insistence, "the prior acts need not be duplicates of the one for which the defendant is now being tried because the admissibility of other crimes evidence depends on the nature and purpose of the evidence." United States v. Mora, 81 F.3d 781, 783 (8th Cir. 1996) (cleaned up). This Court has explained that "[t]he similar-in-kind requirement is less important when the evidence is used to establish motive (as compared to knowledge or the other categories in 404(b))." United States v. Tyerman, 701 F.3d 552, 563 (8th Cir. 2012).

Crow Ghost admitted to law enforcement that he shot Archambault, dragged her body inside his apartment, locked the door, and fled town for several days without reporting the shooting or summoning aid for Archambault. Crow Ghost gave varying accounts as to how the shooting happened. Rule 404(b) allows prior act evidence to establish motive. The government learned that Crow Ghost had confronted Ybarra and Moser on separate occasions because he did not want them talking to Archambault or having a relationship with her. The prior acts were not overly remote in time to the charged offenses. The confrontation with Ybarra took place approximately two months before Archambault's murder. Crow Ghost confronted Moser on the telephone in 2018 or 2019. The interactions with Crow Ghosts were not too remote in time for Rule 404(b) evidence. Cf. United States v. Strong, 415 F.3d 902, 905-06 (8th Cir. 2005) (describing a general reluctance to allow prior act evidence occurring more than 13 years before the crime charged). The record demonstrates the Rule 404(b) evidence admitted at trial fit within the parameters of the rule and was not introduced solely to show Crow Ghost's

propensity to engage in criminal misconduct.  Crow Ghost has failed to show the notice, or the evidence, did not satisfy the requirements of Rule 404(b).

Lastly, Crow Ghost claims the Rule 404(b) evidence was unfairly prejudicial because "plenty of people get jealous, but few follow that human emotion with murder."  Damaging evidence is always prejudicial; the issue we are tasked with resolving is whether the evidence is unfairly prejudicial.  When evaluating a claim of undue prejudice, this Court has stated that a jury "is entitled to know about the context of the crime and any events that help explain the context."  Mora, 81 F.3d at 784.  If the evidence is necessary to explain the defendant's motive for committing the charged offense, this Court has held that the probative value is not substantially outweighed by unfair prejudice.  See United States v. Farish, 535 F.3d 815, 820 (8th Cir. 2008) (upholding the admission of domestic abuse evidence to prove motive for the charged offense of arson).  Before she was murdered, Archambault had discussed with Crow Ghost her desire to travel with Moser to Arizona.  Crow Ghost testified that on Thursday he learned of Archambault's plan to leave town the next day with a male: "Well, she told me - - she indicated to me that she was thinking about going to Arizona, I believe, with her friend.  I don't know her friend.  I've never seen him before in my life.  I don't know who he is.  But she said that she was thinking about going with him, and I said, 'Well, okay.  If you want to go to Arizona, that's what - - that's your prerogative."

The government's Rule 404(b) evidence provided a motive for Crow Ghost to murder Archambault.  Crow Ghost had an opportunity, and did, refute that evidence.  We give "great deference to the district court's weighing of the probative value of evidence against its prejudicial effect."  Tyerman, 701 F.3d at 563.  While prejudicial, the government's evidence was not unfairly prejudicial.  It was within the jury's discretion to weigh the conflicting evidence. We find no error or abuse of discretion in the district court's decision to admit the limited evidence relating to Crow Ghost's prior interactions with Moser and Ybarra, both men Crow Ghost had confronted in the past and expressed jealousy for talking to or attempting to develop a relationship with Archambault.

## 2. *Evidence of Premeditation*

Crow Ghost asserts the government failed to present sufficient evidence to establish premeditation. He concedes, however, that the evidence regarding his jealously arising from Archambault's relationship with Moser and Ybarra provided a motive to commit premeditated murder. Taking the facts and circumstances in the light most favorable to the jury's verdict, there is sufficient evidence for a jury to draw an inference that Crow Ghost acted with premeditation.

The district court appropriately instructed the jury that a killing is premeditated when it results from planning or deliberation, that the time needed for premeditation varies with the person and circumstances, and that the defendant must be conscious and mindful of his intent to kill. See United States v. Thomas, 664 F.3d 217, 223 (8th Cir. 2011). Premeditation can be proven with circumstantial evidence. United States v. Dale, 614 F.3d 942, 963 (8th Cir. 2010). As further explained by this Court:

> On the basis of events before and at the time of the killing, the trier of fact will sometimes be entitled to infer that the defendant actually premeditated and deliberated his intentional killing. Three categories of evidence are important for this purpose: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, Planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which Motive may be inferred; and (3) facts about the Nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

Id. (quoting United States v. Blue Thunder, 604 F.2d 550, 553 (8th Cir. 1979)).

The jury heard evidence of Crow Ghost's and Archambault's turbulent relationship. Crow Ghost described for the jury his relationship with Archambault in October 2020 as "rocky." There is evidence from which a reasonable juror could

infer evidence of planning and motive. Despite living in his apartment for many years without a gun, Crow Ghost purchased a handgun from Runnings in October 2020. That same month Crow Ghost showed up uninvited and unannounced at Ybarra's girlfriend's residence and confronted Ybarra about having a romantic relationship with Archambault. One or two years prior, Crow Ghost had directed another man in Archambault's life—Moser—to stay away from Archambault. Two days before her murder, Archambault discussed with Crow Ghost her plans to go out of town with Moser. The trip ultimately did not happen, which lead to Crow Ghost and Archambault being together over the weekend when Crow Ghost killed her.

Evidence of the manner of killing also gives rise to a reasonable inference of premeditation. Although Crow Ghost provided three different versions of what happened, in one accounting before the jury, Crow Ghost told law enforcement that he aimed and fired at Archambault, who was indisputably shot in the back of the head at a distance of at least three feet away. Armed with this evidence, the jury could reasonably have concluded that Crow Ghost formed the requisite intent when he purchased a handgun the same month that he confronted Ybarra for having a romantic relationship with Archambault and subsequently, in response to an argument regarding infidelity, Crow Ghost retrieved that gun from his bedroom closet and shot Archambault in the head as she tried to escape. Crow Ghost's actions after the shooting also point towards premeditation. Rather than summon assistance, Crow Ghost dragged an unresponsive Archambault into his apartment, changed his clothes, locked the apartment, and left for days. While Crow Ghost argued to the jury that he had no intention or reason to kill Archambault and instead acted in self-defense (which the district court instructed the jury on "out of an abundance of caution"), the jury apparently rejected his testimony. Because there is ample evidence that supports the jury's finding that the killing was premeditated, Crow Ghost's sufficiency of the evidence claim fails.

### 3. Jury Instructions

Lastly, Crow Ghost raises two claims of error in the jury instructions: (1) the district court plainly erred when it did not instruct the jury on imperfect self-defense; and (2) the district court abused its discretion when it failed to instruct the jury on involuntary manslaughter. Neither of Crow Ghost's claims have merit.

The district court reluctantly instructed the jury on self-defense. Crow Ghost did not raise the theory of imperfect self-defense until he filed his motion for a new trial. "An imperfect self-defense involves the defendant's unreasonable use of deadly force to thwart an assault." United States v. Milk, 447 F.3d 593, 599 (8th Cir. 2006). The underlying premise of the claim is that some action was necessary for the defendant to protect himself. Id. Because Crow Ghost did not request an imperfect self-defense instruction, he must show the district court's *sua sponte* failure to give the instruction resulted (1) in an error; (2) that was clear or obvious under current law; (3) that affected his substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. See United States v. Williams, 39 F.4th 1034, 1046 (8th Cir. 2022). Crow Ghost cannot meet his burden.

One significant hurdle for Crow Ghost is the undisputed forensic evidence that Archambault was shot in the back of the head from some distance away. This evidence stands in stark contrast to Crow Ghost's claim that the gun discharged during a physical struggle. Further, none of Crow Ghost's varying explanations for how the shooting happened support self-defense. Twice Crow Ghost indicated that the gun discharged or "went off" during a physical struggle, and once he asserted that he aimed and shot her in the heat of passion. None of Crow Ghost's explanations, nor does the forensic evidence, raise a jury question on whether Crow Ghost truly, although unreasonably, believed the use of force was necessary to avoid imminent harm. The district court did not commit plain error when it failed to *sua sponte* instruct the jury on imperfect self-defense.

-13-

Crow Ghost also challenges the district court's refusal to give his requested instruction on the lesser-included offense of involuntary manslaughter. The district court instructed the jury on first-degree murder, second-degree murder, and voluntary manslaughter. A defendant is entitled to an instruction if he shows there is evidence that would permit a jury to rationally find him guilty of the lesser offense and acquit on the charged offense. United States v. Lasley, 832 F.3d 910, 912-13 (8th Cir. 2016). The mental state for involuntary manslaughter consists of gross or criminal negligence. Id. at 913.

In its post-trial decision, the district court described Crow Ghost's theory of defense as an accidental killing, which was consistent with the first statement Crow Ghost gave to law enforcement. But during closing argument, Crow Ghost focused the jury's attention on his claim of self-defense that he developed during trial, which was essentially the third accounting of the incident offered by Crow Ghost. Crow Ghost testified that the gun discharged when he was trying to fend off Archambault's aggression. We have noted the existence of authority indicating self-defense and involuntary manslaughter may be inconsistent and it can be "error to instruct on the lesser included offense of involuntary manslaughter in the face of a plea of self-defense." United States v. Iron Shield, 697 F.2d 845, 847 (8th Cir. 1983); see also United States v. Browner, 889 F.2d 549, 555 (5th Cir. 1989) (explaining that while there is no *per se* rule against an involuntary manslaughter instruction when there is a claim of self-defense, the dispositive issue is whether the evidence is sufficient to allow a jury to rationally find the defendant guilty of the lesser included offense and not the offense charged).

In short, the evidence in the record is insufficient for a jury to rationally find Crow Ghost acted in a grossly or criminally negligent manner. Crow Ghost recounted for the jury the events immediately before the shooting as follows: "[S]he's grabbing my hair at full length. And soon as I'm walking out the door, I'm trying to leave, rustle out. And then I turn around. The gun was in my right hand, and I tried to break free from her, and the weapon went off, discharged." Crow Ghost claimed the gun fired due to Archambault's aggression, not his own negligent

actions. His claim, however, was contradicted by other evidence, including that the gun was far enough away to not leave gunshot residue or stippling on Archambault's head, that during his second interview he told law enforcement he intentionally aimed and shot Archambault in the heat of passion, that he had expressed jealousy when other men talked to Archambault, and that two days before the shooting Archambault had informed Crow Ghost of her plan to go on a trip with a male friend, who Crow Ghost had previously directed not to talk to Archambault. The evidence does not support Crow Ghost's claim of involuntary manslaughter. Rather, by instructing the jury on the lesser-included offenses of second-degree murder and voluntary manslaughter as well as Crow Ghost's claim of self-defense, the district court submitted all permissible issues supported by the evidence to the jury.

## III.    CONCLUSION

The judgment of the district court is affirmed.

_____